UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| PEDRO LUGO, individually and on behalf of all similarly situated individuals,<br><br>*Plaintiff*,<br><br>v.<br><br>INOVA HEALTH CARE SERVICES,<br><br>*Defendant*, | ) | No. 1:24-cv-00700-PTG-WEF<br><br>Hon. Patricia T. Giles |

**PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY**

Plaintiff Pedro Lugo, through his undersigned counsel, hereby submits this notice of supplemental authority to inform the Court of the following decisions relevant to this Court's decision on Defendant's pending Motion to Dismiss:

*Cooper v. Mount Siani Health Systems Inc.*, No. 23-cv-9485 (PAE), 2024 WL 3586357 (S.D. NY Jul. 30, 2024) (attached hereto as Exhibit A); *Gay v. Garnet Health*, No. 23-cv-06950 (NSR), 2024 WL 4203263 (S.D. NY Sep. 16, 2024) (attached hereto as Exhibit B); *Murphy v. Thomas Jefferson University Hospitals, Inc.*, No. 22-4674, 2024 WL 4350328 (E.D. Penn. Sep. 30, 2024) (attached hereto as Exhibit C); *A.D. v. Aspen Dental Management, Inc.*, No. 24 C 1404, 2024 WL 4119153 (N.D. Ill. Sep. 9, 2024) (attached hereto as Exhibit D); *M.R. v. Salem Health Hospitals and Clinics*, No. 6:23-cv-01691-AA, 2024 WL 3970796 (D. Or. Aug. 28, 2024) (attached hereto as Exhibit E).

Dated: October 10, 2024

Respectfully Submitted,

PEDRO LUGO, individually and on behalf of a class of similarly situated individuals,

By: /s/ Kyle McNew
One of His Attorneys

Kyle McNew (Va. Bar # 73210)
MICHIE HAMLEET
310 4th St. NE
Charlottesville, VA 22902
T: (434) 951-7234
F: (434) 951-7254
kmcnew@michiehamlett.com

Eugene Y. Turin (*pro hac vice*)
Jordan R. Frysinger (*pro hac vice*)
William Kingston (*pro hac vice*)
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Floor
Chicago, IL 60601
Tel: (312) 893-7002
eturin@mcgpc.com
jfrysinger@mcgpc.com
wkingston@mcgpc.com

*Attorneys for Plaintiff and the putative class*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2024, I electronically filed the foregoing *Plaintiff's Notice of Supplemental Authority* with the Clerk of the Court using the CM/ECF system. A copy of said document will be electronically transmitted to all counsel of record.

/s/ Kyle McNew

# EXHIBIT A

2024 WL 3586357
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ronda COOPER, Coral Fraser, David Gitlin and Gilbert Manda, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
MOUNT SINAI HEALTH SYSTEMS, INC., Defendants.

23 Civ. 9485 (PAE)
|
Signed July 30, 2024

**Synopsis**
**Background:** Internet users brought putative class action against healthcare provider for violation of the Electronic Communications Privacy Act (ECPA), deceptive business consumer acts and practices, negligence, invasion of privacy, breach of implied contract, breach of fiduciary duty, unjust enrichment, breach of confidence, constructive bailment, and breach of the implied covenant of good faith and fair dealing, alleging that provider transmitted their personally identifiable information and protected health information to social media company by means of tracking technologies on provider's webpages, and thereby caused users to receive targeted ads related to their medical conditions on their social media accounts. Provider filed motion to dismiss for failure to state a claim.

**Holdings:** The District Court, Paul A. Engelmayer, J., held that:

[1] users plausibly alleged that provider disclosed identifiable health information under the Health Insurance Portability and Accountability Act (HIPAA)

[2] users plausibly alleged that disclosure was knowing and deliberate, in violation of HIPAA, and thus provider was not shielded from ECPA liability;

[3] users plausibly alleged a cognizable injury, for purposes of a claim of deceptive consumer acts and practices under New York law;

[4] users could maintain claim for intentional interference with interest in solitude or seclusion as an alternative to their claim for negligence;

[5] claims for breach of implied contract, breach of fiduciary duty, breach of confidence, constructive bailment, and breach of the implied covenant of good faith and fair dealing under New York were not duplicative of a claim for breach of physician-patient confidentiality; and

[6] under New York law, users' claim for unjust enrichment was duplicative of their claim for breach of implied contract.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

West Headnotes (18)

**[1]** **Federal Civil Procedure** Evidence; pleadings and supplementary material
**Federal Civil Procedure** Insufficiency in general

In a putative class action, to survive a motion to dismiss, the complaint must state a claim based on the facts alleged as to the named plaintiffs, not the putative class.

**[2]** **Telecommunications** Authorization or consent

The crime-tort exception to the waiver of liability under the Electronic Communications Privacy Act (ECPA) which applies when the party intercepting a communication is a party thereto, or when one of the parties consents to interception, is construed narrowly; the crime or tort must have been the primary motivation or a determinative factor for the defendant's conduct, and the defendant must have a criminal or tortious purpose at the time of the interception that is independent of the act of recording itself. 18 U.S.C.A. §§ 2511(1), 2511(2)(d), 2520.

1 Case that cites this headnote

[3] **Telecommunications** Intent; willfulness

The mere existence of a lawful purpose for interception of a communication does not, alone, sanitize an interception that was also made for an illegitimate purpose, for purposes of liability under the Electronic Communications Privacy Act (ECPA). 18 U.S.C.A. §§ 2511(1), 2511(2)(d), 2520.

[4] **Torts** Privacy in General

New York law does not recognize a legal claim for invasion of privacy.

[5] **Telecommunications** Authorization or consent

A defendant's criminal or tortious purpose of knowingly disclosing individually identifiable health information to another person, in violation of the Health Insurance Portability and Accountability Act (HIPAA), may satisfy the crime-tort exception to the waiver of liability under the Electronic Communications Privacy Act (ECPA) which applies when the party intercepting a communication is a party thereto, or when one of the parties consents to interception. 18 U.S.C.A. §§ 2511(1), 2511(2)(d), 2520; 42 U.S.C.A. § 1320d-6.

1 Case that cites this headnote

[6] **Health** Records and duty to report; confidentiality in general

**Telecommunications** Authorization or consent

Internet users' allegation that they received targeted online ads on social media which were keyed to their distinct health conditions, after they entered information disclosing these conditions on healthcare provider's websites, was sufficient to plausibly allege that provider disclosed private medical information to entities which operated tracking tools on its websites, for purposes of determining whether users adequately pleaded that provider violated the Health Insurance Portability and Accountability Act (HIPAA), and therefore fell within the crime-tort exception to the waiver of liability under the Electronic Communications Privacy Act (ECPA) for interception of communications by a party thereto, or when one of the parties has consented to interception. 18 U.S.C.A. §§ 2511(1), 2511(2)(d), 2520; 42 U.S.C.A. § 1320d-6; 45 C.F.R. § 160.103.

1 Case that cites this headnote

[7] **Health** Records and duty to report; confidentiality in general

**Telecommunications** Authorization or consent

Internet users plausibly alleged that healthcare provider's purported disclosure of their private medical information to third-parties which operated tracking tools on provider's websites was knowing and deliberate, in violation of the Health Insurance Portability and Accountability Act (HIPAA), and thus users adequately pleaded the crime-tort exception to the ECPA's waiver of liability for interception of communications by a party thereto, or when one of the parties has consented to interception; users alleged that adding tracking tools to websites was a multi-step process that had to be undertaken by provider, as websites' owner, that provider configured tools to capture certain user events, and that provider had an economic motive in using the tools, namely to improve its marketing. Electronic Communications Privacy Act, 18 U.S.C.A. §§ 2511(1), 2511(2)(d), 2520 (ECPA); 42 U.S.C.A. § 1320d-6.

[8] **Telecommunications** Intent; willfulness

The presence of a primary financial motive, rather than a criminal motive, does not inoculates a defendant from liability under the Electronic Communications Privacy Act (ECPA). 18 U.S.C.A. §§ 2511(1), 2511(2)(d), 2520.

[9] **Antitrust and Trade Regulation** Nature and Elements

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

To state a claim for deceptive consumer acts and practices under New York law, a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice. N.Y. General Business Law § 349.

[10] **Antitrust and Trade Regulation** Reliance; causation; injury, loss, or damage

To state a claim for deceptive consumer acts and practices under New York law, a plaintiff must allege actual injury, although that need not take the form of a pecuniary harm. N.Y. General Business Law § 349.

[11] **Antitrust and Trade Regulation** Privacy

Internet users whose information was collected via tracking tools on healthcare provider's websites plausibly alleged a cognizable injury, as required to state claim for deceptive consumer acts and practices under New York law, in their action against provider; users alleged that tracking tools collected confidential, individually identifiable information constituting medical records without patients' knowledge or consent, and that provider's deceptive representations that it would not disclose such information to third parties caused privacy injury by inducing patients to submit private medical data and thereby lose control of it. N.Y. General Business Law § 349.

[12] **Torts** Nature and form of remedy

Internet users could maintain claim against healthcare provider for intentional interference with users' interest in solitude or seclusion, regarding the purported collection of their private health information via tracking tools on provider's websites, as an alternative to their claim for negligence, which alleged that provider failed to take due care not to violate the law by divulging private health information. Fed. R. Civ. P. 8(e)(2).

[13] **Federal Civil Procedure** Alternate, Hypothetical and Inconsistent Claims

Internet users' common-law claims against healthcare provider for breach of implied contract, breach of fiduciary duty, breach of confidence, constructive bailment, and breach of the implied covenant of good faith and fair dealing under New York law did not need to be dismissed in favor of a claim for breach of physician-patient confidentiality, on the basis of duplicative pleading; users did not actually put forth a claim for breach of physician-patient confidentiality, and lack of such a claim in the pleadings meant that court was ill-equipped to say whether the claim would necessarily be held more appropriate than the other claims.

[14] **Unjust Enrichment and Constructive Contracts** Elements of unjust enrichment in general

Under New York law, unjust enrichment lies as a quasi-contract claim that contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties.

[15] **Unjust Enrichment and Constructive Contracts** Elements of unjust enrichment in general

A claim for unjust enrichment is available under New York law only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff.

[16] **Unjust Enrichment and Constructive Contracts** Effect of Express Contract

An unjust enrichment claim is not available under New York law where it simply duplicates, or replaces, a conventional contract or tort claim.

**[17]** **Unjust Enrichment and Constructive Contracts** 🔑 Effect of express contract

Under New York law, internet users' claim against healthcare provider for unjust enrichment was duplicative of users' claim for breach of implied contract, and thus dismissal of unjust-enrichment claim was required, even though users appeared to plead distinct damages for unjust enrichment, where both claims were based on the same underlying conduct, namely provider's allegedly wrongful collection and disbursement of users' confidential medical information via tracking tools on provider's websites.

**[18]** **Unjust Enrichment and Constructive Contracts** 🔑 Duplicative claims or remedies

Under New York law, an opportunity for plaintiffs to glean a larger damage award does not distinguish the violative conduct alleged under the rubric of unjust enrichment from that underlying other claims, for purposes of determining whether the unjust enrichment claim should be dismissed as duplicative.

**Attorneys and Law Firms**

David S. Almeida, Almeida Law Group LLC, Chicago, IL, James Jackson Bilsborrow, Weitz & Luxenberg, PC, New York, NY, for Plaintiffs.

David Alan Carney, Baker & Hostetler, LLP, Cleveland, OH, Robyn Mara Feldstein, Baker Hostetler, New York, NY, for Defendants.

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

***1** Plaintiffs Ronda Cooper, Coral Fraser, David Gitlin, and Gilbert Manda ("Plaintiffs") bring this putative class action against defendant Mount Sinai Health Systems, Inc. ("Mount Sinai"). They allege that Mount Sinai, through internet tracking technologies, improperly disclosed their private health-related information to Meta Platforms, Inc., d/b/a Meta ("Facebook") for monetary gain.

Pending now is Mount Sinai's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court denies the motion in substantial part, granting it only as to Plaintiffs' claims for unjust enrichment and invasion of privacy.

## I. Background

### A. Factual Background [1]

Mount Sinai owns and operates eight hospitals and over a dozen medical centers in the New York City area, and employs more than 43,000 staff members, including 7,400 primary and specialty care physicians. Dkt. 16 ("FAC") ¶ 1. As part of the medical services it provides, Mount Sinai controls and maintains a website, https://mountsinai.org/, and a web-based MyChart patient portal (together, the "Web Properties"). *Id.* ¶ 3. [2] Mount Sinai encourages its patients to use its Web Properties to "communicate with their healthcare providers, access lab and test results, manage prescriptions and request refills, manage medical appointments, search medical conditions and treatment options, sign up for events and classes," and so forth. *Id.* ¶ 4. Mount Sinai also invites patients to "share and search for personal medical information about their own physical and mental health" using the Web Properties. *Id.*

Plaintiffs, all residents of New York, accessed Mount Sinai's Web Properties on their computers and mobile devices to look for providers, review conditions and treatment options, make appointments, and communicate with their healthcare providers. *Id.* ¶¶ 31–35. They allege that, using two tracking technologies, the Facebook Tracking Pixel (the "Pixel") and Facebook's Conversions Application Programming Interface ("CAPI"), Mount Sinai transmitted their personally identifiable information ("PII") and protected health information ("PHI") (together, "Private Information") to Facebook without their knowledge, consent, or express written authorization. *Id.* ¶¶ 6–11, 19.

#### 1. Facebook's Tracking Technologies

***2** Facebook operates the world's largest social media company. In 2021, it generated $117 billion in revenue, roughly 97% of which came from selling advertising space.

*Id.* ¶ 109. In conjunction with its advertising, Facebook encourages and promotes entities and website owners, such as Mount Sinai, to use its "Business Tools" to market products and services to individuals. *Id.* ¶ 110. Facebook's Business Tools, including the Pixel, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling interception and collection of user activity on those platforms. *Id.* ¶ 111, The Pixel transmits information from users' browsers to third parties, including Facebook and Google, Inc. (collectively, "Pixel Information Recipients"). *Id.* ¶ 16.

Website owners like Mount Sinai which use Facebook's Business Tools must agree to Facebook's Business Tools Terms. In these, Facebook requires website owners to "represent and warrant" that they have adequately and prominently notified users about the collection, sharing, and usage of data through Facebook's Business Tools (including the Pixel and CAPI) and that website owners "will not share Business Tool Data ... that [websites] know or reasonably should know ... include health or financial information or other categories of sensitive information." *Id.* ¶ 117. Facebook does not take other steps to verify that businesses using Pixel have obtained the required consent, but instead relies on this "honor system." *Id.* ¶ 126.

The Pixel is customizable and programmable, meaning that the website owner controls which of its web pages contain the Pixel and which events are tracked and transmitted to Pixel Information Recipients. *Id.* ¶¶ 59, 114. The Pixel is automatically configured to transmit "Standard Events," such as when a user visits a particular webpage, the webpage's Universal Resource Locator ("URL") and metadata, and button clicks. An advertiser can also build "custom events" to track other user actions. *Id.* ¶¶ 119–120. The Pixel prompts users' web browsers to instantaneously and surreptitiously duplicate and transmit users' communications with the host webpage to Facebook's servers. *Id.* ¶ 121. This simultaneous transmission contains the original electronic communications (GET requests) sent to the host website, plus additional data that the Pixel is configured to collect. *Id.* ¶ 122.

Because internet users with technical know-how can circumvent the browser-based technology, Facebook offers CAPI as a workaround *Id.* ¶ 131. Unlike the Pixel, CAPI does not cause a user's browser to transmit information directly to Facebook. Rather, it tracks the user's website interactions, records and stores that information on the website owner's servers, and then transmits that data from the website owner's servers to Facebook. *Id.* ¶ 19. Because CAPI functions from the website owner's servers, it cannot be stymied by the use of anti-pixel software or other mechanisms such as ad blockers. *Id.* ¶ 20.

When the website visitor is a Facebook user, the information collected is associated with that user's Facebook ID. The Facebook ID captures the user's name and Facebook profile, which contains demographic and other information about the user, including pictures, personal interests, work history, and relationship status. *Id.* ¶¶ 127, 129. The Business Tools collect data regardless of whether the visitor has a Facebook account; Facebook maintains "shadow profiles" on users without Facebook accounts. *Id.* ¶ 128. After receiving these transmissions, Facebook processes, analyzes, and assimilates the data into datasets like Core Audiences and Custom Audiences. *Id.* ¶ 127. A website owner can create a "Custom Audience" to target ads to users who have shown interest in its business or product and measure the success of its marketing campaigns. *Id.* ¶¶ 143–47.

***3** Facebook advertises its Pixel as a piece of code "that can help you better understand the effectiveness of your advertising and the actions people take on your site, like visiting a page or adding an item to their cart. You'll also be able to see when customers took an action after seeing your ad on Facebook and Instagram, which can help you with retargeting." It tells its customers: "when you use the Conversions API alongside the Pixel, it creates a more reliable connection that helps the delivery system decrease your costs." *Id.* ¶ 217 (emphasis removed). The Pixel thus enables "retargeting"—online marketing that targets users with ads based on previous internet communications and interactions. *Id.* ¶ 218. Facebook's purpose in collecting user data is to make money. *Id.* ¶ 134.

**2. Mount Sinai's Privacy Policies**

Mount Sinai publishes several privacy policies that represent to its patients and visitors to its Web Properties that it will keep their Private Information private and secure. *Id.* ¶ 148. The published Mount Sinai Privacy Policy states: "[Mount Sinai] employs a variety of online security measures to safeguard and keep your information private." *Id.* ¶¶ 149–50. It adds that:

> [Mount Sinai] does not share your personally identifiable information with third parties without your consent, except for third–party suppliers that perform essential business or administrative services for us (for example, our web hosting provider). [Mount Sinai] provides these suppliers with information they need to perform such services and asks that they either comply with this Privacy Policy or maintain comparable privacy policies that protect your personally identifiable information.

*Id.* Mount Sinai's Notice of Privacy Practices explains its legal duties with respect to Private Information and sets out the limited exceptions for when it can legally use and disclose Private Information. *Id.* ¶ 151. [3] Mount Sinai's Privacy Policy does not permit it to use or disclose Private Information for marketing purposes. *Id.* ¶ 152. Mount Sinai acknowledges that it is "required by law to protect the privacy of [ ] health information." *Id.* ¶ 153.

### 3. Mount Sinai's Use of Facebook's Tracking Technologies

The FAC alleges that Mount Sinai used Facebook's Business Tools to intercept, duplicate, and re-direct their Private Information to Pixel Information Recipients. *Id.* ¶ 136. Mount Sinai tracked users through "PageView" (which identifies the User as having viewed the particular webpage), "Microdata" (which contains page metadata), and "SubscribedButtonClick" (which tracks each click on the webpage and shares the metadata of buttons clicked by the User, such the "inner text" of the button) events, and through custom events such as those reflected on the patient's "My Chart" portal, accessible through an app. Mount Sinai disclosed users' search queries, when they used the MyChart app, clicked to access and view the bill page, clicked to request an appointment, and when they accessed and viewed their care and treatment options. *Id.* ¶¶ 97, 123. Mount Sinai routinely provided Facebook with its patients' Facebook IDs, IP addresses and/or device IDs, and other information the patients entered into Mount Sinai's website, including their medical searches, treatment requests, the webpages they viewed, and their names, email addresses, and/or phone numbers. *Id.* ¶ 124. The FAC alleges that plaintiffs were easily identifiable based on this information. They contend that the Health Insurance Portability and Accountability Act ("HIPAA") requires Mount Sinai to anonymize such information to protect patients' privacy. *Id.* ¶ 125. [4]

***4** The FAC alleges that a primary reason Mount Sinai decided to embed the Pixel and other tracking technologies on its Web Properties was to improve its marketing campaigns and reduce its marketing costs. *Id.* ¶ 213. Facebook, after receiving Private Information communicated on Mount Sinai's Web Properties, forwards this data and its analysis of this data to Mount Sinai to use for commercial purposes. *Id.* ¶¶ 214–15. Mount Sinai realizes a commercial benefit from using Facebook's Business Tools because the collected information enables it to target ads to existing and prospective patients. *Id.* ¶ 216. Insofar as patients' Private Information allows companies to gain insight into customers, targeted ads, and boost revenues, this data is valuable and monetizable. *Id.* ¶¶ 221, 231. In exchange for disclosing patients' Private Information, Mount Sinai is compensated by the Pixel Information Recipients, such as Facebook, in the form of enhanced advertising services and more cost-efficient marketing on their platforms. *Id.* ¶ 222.

### 4. Each Plaintiff's Use of Web Properties and Receipt of Targeted Ads [5]

**[1]** The FAC alleges that each named Plaintiff was aware of Mount Sinai's duty of confidentiality and reasonably expected that the Private Information he or she provided to Mount Sinai would remain private and would not be shared with third parties for commercial purpose unrelated to patient care. *Id.* ¶¶ 197–99.

#### *i. Plaintiff Ronda Cooper*

Beginning in or around 2021, Cooper began using Mount Sinai's Web Properties on his phone and computer to research conditions, treatments, doctors, and specialists, and to schedule appointments. *Id.* ¶ 251. As recently as May 2023, Cooper disclosed his Private Information to Mount Sinai, including information about his specific medical conditions.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

*Id.* ¶¶ 252, 254. After disclosing his Private Information to Mount Sinai, Cooper began receiving targeted ads, including ads related to these conditions, on his social media accounts such as Facebook. *Id.* ¶ 262.

*ii. Plaintiff Coral Fraser*

Beginning in or around 2017, Fraser started to use Mount Sinai's website on her phone to research conditions, treatments, doctors, specialists, and to schedule appointments. *Id.* ¶ 267. As recently as May 2022, Fraser disclosed her Private Information to Mount Sinai, including information about her specific medical conditions. *Id.* ¶¶ 268–79. After disclosing her Private Information to Mount Sinai, Fraser began receiving targeted ads, including ads related to these conditions, on her social media accounts such as Facebook and/or Instagram. *Id.* ¶¶ 279–80.

*iii. Plaintiff David Gitlin*

Beginning in or around 2015, Gitlin started to use Mount Sinai's website on his phone and computer to research conditions, treatments, doctors, and specialists. *Id.* ¶ 283. Beginning in or around 2020, Gitlin started to use Mount Sinai's patient portal to schedule appointments. *Id.* ¶ 284. As recently as September 2023, Cooper disclosed his Private Information to Mount Sinai, including information about his specific medical conditions. *Id.* ¶¶ 285, 287. After disclosing his Private Information to Mount Sinai, Cooper began receiving targeted ads, including ads related to these conditions, on his social media accounts such as Facebook. *Id.* ¶¶ 295–96.

*iv. Plaintiff Gilbert Manda*

Beginning in or around August 2022, Manda started to use Mount Sinai's website on his phone and computer to receive healthcare services from Mount Sinai. *Id.* ¶ 300. Beginning in or around April 2023, Manda started to use Mount Sinai's patient portal. *Id.* ¶ 301. As recently as September 2023, Manda disclosed his Private Information to Mount Sinai, including information about his specific medical conditions. *Id.* ¶¶ 302, 304. After disclosing his Private Information to Mount Sinai, Manda alleges that he began receiving targeted ads, including ads related to his medications, conditions, treatments, and specific medical diagnoses, on his social media accounts such as Facebook. *Id.* ¶ 312.

* * *

***5** Out of respect for privacy, the Court, heeding the redactions from the FAC as publicly filed, has not identified any individual plaintiff's health condition(s). It suffices to say that the conditions the FAC alleges were divulged by one or more plaintiffs in using Mount Sinai's web services, but which later were the subject of that plaintiff's targeted Facebook ads, included anxiety/depression, pregnancy, and high cholesterol. *See generally id.* ¶¶ 252–312.

### B. Procedural History

On October 27, 2023, Plaintiffs filed this action. Dkt. 1. On December 22, 2023, Mount Sinai filed a motion to dismiss. Dkt. 13. On December 28, 2023, the Court ordered Plaintiffs to oppose the motion or amend the complaint, pursuant to Federal Rule of Civil Procedure 15(a). Dkt. 15, On January 12, 2024, Plaintiffs filed the FAC, the operative complaint. Dkt. 16 ("FAC").

The FAC brings 10 claims, each on behalf of a putative class. These include one claim under federal law, under the Electronic Communications Privacy Act (the "ECPA" or "Wiretap Act"), 18 U.S.C. §§ 2510, *et seq.* FAC ¶¶ 341–70, It also contains a statutory claim for deceptive practices under New York General Business Law § 349, FAC ¶¶ 447–65, and eight claims under New York State common law: for negligence, *id.* ¶¶ 371–80, invasion of privacy, *id.* ¶¶ 381–94, breach of implied contract, *id.* ¶¶ 395–405, breach of fiduciary duty, *id.* ¶¶ 406–412, unjust enrichment, *id.* ¶¶ 413–20, breach of confidence, *id.* ¶¶ 421–28, constructive bailment, *id.* ¶¶ 429–37, and breach of the implied covenant of good faith and fair dealing, *id.* ¶¶ 438–46.

On January 26, 2024, Mount Sinai filed a motion to dismiss the FAC and a memorandum of law in support. Dkts. 18, 19 ("Def Br."). On February 9, 2024, Plaintiffs filed an opposition. Dkt. 20 ("Pl. Br."). On February 16, 2024, Mount Sinai filed a reply. Dkt. 21 ("Def. Reply Br."). [6]

## II. Legal Standards Governing Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558, 127 S.Ct. 1955. When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145. That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

**III. Discussion**

Mount Sinai moves to dismiss the FAC in its entirety. The Court considers each claim in turn.

**A. Federal Wiretap Act**

Mount Sinai argues that the claim under the ECPA fails because the FAC does not adequately allege that Mount Sinai intercepted communications with the requisite intent. Def. Br. at 6–10. The FAC adequately so alleges.

The ECPA provides for a private right of action against "any person who ... intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept wire, oral, or electronic communication." 18 U.S.C. § 2511. "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id.* § 2510(4). The statute excepts from liability interceptions where the intercepting person "is a party to the communication or where one of the parties to the communication has given prior consent to such interception." *Id.* § 2511(2)(d). But that exception does not apply where the "aggrieved individual ... has had her oral communications intentionally intercepted by a party to those communications for the purpose of committing a crime or tort." *Caro v. Weintraub*, 618 F.3d 94, 97 (2d Cir. 2010) (citing 18 U.S.C. §§ 2520, 2511(1), 2511(2)(d)).

***6 [2] [3]** This "crime-tort exception" is "construed narrowly." *In re DoubleClick Inc. Privacy Litig. ("DoubleClick")*, 154 F. Supp. 2d 497, 515 (S.D.N.Y. 2001); *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013). The crime or tort must have been the "primary motivation" or "a determinative factor" for the defendant's conduct. *DoubleClick*, 154 F. Supp. 2d at 514–15; *United States v. Tarantino*, 617 Fed. App'x. 62, 65 (2d Cir. 2015). Thus, the defendant must have a criminal or tortious purpose at the time of the interception that is "independent of the act of recording itself." *Caro*, 618 F.3d at 100 ("If, at the moment he hits 'record,' the offender does not intend to use the recording for criminal or tortious purposes, there is no violation. But if, at the time of the recording, the offender plans to use the recording to harm the other party to the conversation, a civil cause of action exists under the Wiretap Act."). That a defendant's conduct was criminal or tortious does not suffice. *Id.* But "the mere existence of [a] lawful purpose alone does not 'sanitize a[n interception] that was also made for an illegitimate purpose.' " *DoubleClick*, 154 F. Supp. 2d at 514 (quoting *Sussman v. ABC*, 186 F.3d 1200, 1202 (9th Cir. 1999)).

The parties' dispute here centers on whether the crime-tort exception is adequately pled. For purposes of its motion, Mount Sinai does not dispute that it "intercepted" Plaintiffs' communications (*i.e.*, their user activity on Mount Sinai's Web Properties). And Plaintiffs do not dispute that Mount Sinai is alleged to have been a party to the communications at issue, requiring the crime-tort exception to apply for it be liable. [7] FAC ¶ 362.

**[4]** Plaintiffs argue that the exception applies because, as pled, Mount Sinai intercepted their communications with the purpose of disclosing them to Facebook and other third parties without Plaintiffs' consent "in violation of the laws of the United States and New York," FAC ¶¶ 363–64, in particular, with the criminal purpose to violate HIPAA, *id.* ¶ 165. [8]

***7** HIPAA makes it a crime for a "covered entity"—which includes health care providers—to knowingly disclose individually identifiable heath information without authorization "with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6; 45 C.F.R. § 160.103. Such information is "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to

an individual;" and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

**[5]** A defendant's criminal or tortious purpose of "knowingly ... disclos[ing] individually identifiable health information to another person," 42 U.S.C. § 1320d-6, in violation of HIPAA, may satisfy the crime-tort exception. *See Kane v. Univ. of Rochester*, No. 23 Civ. 6027 (FPG), 2024 WL 1178340, at *7 (W.D.N.Y. Mar. 19, 2024) ("Plaintiffs have plausibly alleged that Defendant's purpose was to commit an act that is punishable as a crime under 42 U.S.C. § 1320d-6: knowingly disclosing [individually identifiable health information] without authorization for marketing purposes."); *In re Grp. Health Plan Litig.*, No. 23 Civ. 267 (JWB), ––– F.Supp.3d ––––, ––––, 2023 WL 8850243, at *8 (D. Minn. Dec. 21, 2023) (crime-tort exception plausibly applies where defendant's primary motivation was to use patient data for marketing, in violation of HIPAA); *Kurowski v. Rush Sys. for Health*, No. 22 Civ. 5380, 2023 WL 8544084, at *3 (N.D. Ill. Dec. 11, 2023) ("All of these allegations, taken together, are sufficient to invoke the HIPAA exception-to-the-party-exception[.]"); *see also Cousin v. Sharp Healthcare*, No. 22 Civ. 2040 (MMA) (DDL), ––– F.Supp.3d ––––, ––––, 2023 WL 8007350, at *5 (S.D. Cal. Nov. 17, 2023) (denying motion to dismiss [California Invasion of Privacy Act] claim, noting that analysis tracks that under the federal Wiretap Act, where complaint plausibly alleged that defendants conveyed their private health information); *cf. Doe v. Kaiser Found. Health Plan, Inc.*, No. 23-Civ. 02865 (EMC), 2024 WL 1589982, at *10 (N.D. Cal. Apr. 11, 2024) (dismissing wiretap claim because "[v]iolation of HIPAA was not the purpose of the alleged interception."); *Okash v. Essentia Health*, No. 23 Civ. 482 (JRT) (LIB), 2024 WL 1285779, at *4 (D. Minn. Mar. 26, 2024) ("[Plaintiff] alleges that [defendant] acted for the purpose of criminally violating HIPAA and tortiously invading [his] privacy. But because neither the alleged HIPAA nor privacy violations were independent of the interception, the crime-tort exception does not apply.").

**[6]** With all reasonable inferences drawn in its favor, the FAC plausibly alleges that Mount Sinai knowingly disclosed individually identifiable health information to Pixel Information Recipients and thereby violated HIPAA. With respect to individually identifiable health information, the FAC alleges that Mount Sinai disclosed Plaintiffs' names, emails, computer IP addresses, device identifiers, web URLs, and the days on which they sought treatment, as well as the services they selected, and their patient statuses, medical conditions, treatments, and provider and appointment information. FAC ¶ 206. The FAC alleges that Plaintiffs thereafter received targeted ads on Facebook keyed to their confidential health conditions. *See id.* ¶¶ 251–315. These allegations make plausible that at least some information transmitted was individually identifiable health information. *Cf. Santoro v. Tower Health*, No. 22 Civ. 4580, 2024 WL 1773371, at *4 (E.D. Pa. Apr. 24, 2024) ("As best as we can tell from the allegations and undisputed representations, whether individually identifiable health information is intercepted could depend upon how the particular user interacts with the website, including how long they spend on a page, what links are clicked on, and what search terms they input—as well as the nature of the user's health condition and treatment plan. We need not define what constitutes HIP[A]A-protected information or otherwise flesh out plaintiffs' speculation. It is plaintiffs' responsibility to make factual allegations that plausibly state a claim for relief, and they have not done so here ... For that reason, we conclude that plaintiffs fail to state a claim for a violation of the Wiretap Act."); *Kurowski v. Rush Sys. for Health*, 683 F. Supp. 3d 836, 843 (N.D. Ill. 2023) (complaint did not allege sufficient facts to support inference of disclosure of individually identifying health information; court contrasts defendant's disclosure of "metadata" with case in which a plaintiff "entered data relating to her heart issues and high blood pressure in MyChart and later received advertisements on Facebook, including at least one advertisement relating to high blood pressure medication." (citing *Doe v. Regents of Univ. of California*, 672 F. Supp. 3d 813, 816 (N.D. Cal. 2023))); *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) ("Information available on publicly accessible websites stands in stark contrast to the personally identifiable patient records and medical histories protected by these statutes —information that unequivocally provides a window into an individual's personal medical history."). The claim that Plaintiffs were sent targeted ads keyed to distinct health conditions after they entered information disclosing those conditions into Mount Sinai's Web Properties plausibly alleges that Mount Sinai illegally disclosed their private medical information.

***8** **[7]** The FAC also plausibly alleges that Mount Sinai engaged in such disclosures knowingly and deliberately. It alleges that the process of adding the Pixel to a webpage is a multi-step process that must be undertaken by the website owner—here, Mount Sinai. FAC ¶ 114. And it alleges that Mount Sinai configured Facebook's

Business Tools, to capture "PageView," "Microdata," and "SubscribedButtonClick" events, and to create a patient-customized "MyChart" event that would be transmitted to Facebook. *Id.* ¶ 123. By deciding to track these events, the FAC alleges, Mount Sinai routinely sent Facebook individually identifiable information that the Plaintiffs had had entered into Mount Sinai's Web Properties. *Id.* ¶ 124. And the FAC plausibly alleges that Mount Sinai had an economic motive—to improve its marketing—to install the Pixels and CAPI. FAC ¶¶ 11 ("[Mount Sinai] installed tracking technologies on its Web Properties to collect and disclose to unauthorized third parties their Private Information for its own pecuniary gain."), 26 ("Mount Sinai chose to use the Pixel and CAPI data for marketing purposes to bolster its revenue."), 213 ("One of the primary reasons that Mount Sinai decided to embed Pixels and other tracking technologies on its Web Properties was to improve marketing by creating campaigns that maximize conversions and thereby decrease costs to Mount Sinai and boost its revenues."), 358 ("Mount Sinai intentionally used wire or electronic communications to increase its profit margins.").

Mount Sinai will be at liberty to attempt to establish in discovery facts supporting, *inter alia*, that, to the extent it took the above actions, it did so without intending to facilitate Facebook's receipt of confidential patient information or to financially benefit. Mount Sinai may be able to establish, at summary judgment or trial, that it acted without the requisite knowledge and intent. But, taking the FAC's allegations as true, as the Court must at the motion to dismiss stage,[9] they plausibly support the inference that Mount Sinai, for commercial ends, intentionally disclosed individually identifiable patient health information, and thus violated HIPAA, which makes it a crime for a health care provider to disclose individually identifiable health information for commercial gain. 42 U.S.C. § 1320d-6.[10] *See Caro*, 618 F.3d at 99 ("At the time of the recording the offender must intend to use the recording to commit a criminal or tortious act."); *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d at 515 ("[T]he legislative record suggests that the element of 'tortious' or 'criminal' mens rea is required to establish a prohibited purpose under § 2511(2)(d)."); *Cohen v. Casper Sleep Inc.*, No. 17 Civ. 9325, 2018 WL 3392877, at *4 (S.D.N.Y. July 12, 2018) ("[Plaintiff] fails to demonstrate that Defendants' primary purpose was to commit a tort. Instead, he claims that Defendants' conduct amounted to a tort."); *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1078 (N.D. Cal. 2023) ("Determination of whether actual consent was given depends on what Meta disclosed to healthcare providers, how it described and trained healthcare providers on the Pixel, and how the healthcare providers understood the Pixel worked and the information that then could or would be collected by Meta. These evidence-bound determinations are inappropriate to reach on this motion.").

***9** Mount Sinai's two arguments to the contrary are unavailing.

**[8]** First, relying on statements in out-of-circuit cases applying the ECPA to conduct not alleged to violate HIPAA, it argues the mere fact that it acted for monetary gain does not mean that it had a criminal or tortious purpose. *See In re Google Inc. Gmail Litig.*, 13 Civ. 2430 (LHK), 2014 WL 1102660, at *18 n.13 (N.D. Cal. Mar. 18, 2014); *Rodriguez v. Google LLC*, 20 Civ. 4688 (RS), 2021 WL 2026726, at *6 n.8 (N.D. May 21, 2021); *Katz-Lacabe v. Oracle Am.*, Inc., 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023). But where a covered person intentionally disclosed patients' individually identifiable health information, HIPAA makes such a crime, and indeed imposes enhanced penalties when such was done for, *inter alia*, a "commercial advantage" or "personal gain." 42 U.S.C. § 1320d-6 ("A person who knowingly and in violation of this part—(1) uses or causes to be used a unique health identifier; (2) obtains individually identifiable health information relating to an individual; or (3) discloses individually identifiable health information to another person, shall ... if the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm, be fined not more than $250,000, imprisoned not more than 10 years, or both."). Mount Sinai's broad theory that the presence of a primary financial motive inoculates a defendant from liability under the ECPA is wrong. *See DoubleClick*, 154 F. Supp. 2d at 514 (quoting *Sussman v. ABC*, 186 F.3d 1200, 1202 (9th Cir. 1999)); *see also R.C. v. Walgreen Co.*, No. 23 Civ. 1933 (JGB) (SPX), ––– F.Supp.3d ––––, ––––, 2024 WL 2263395 at *15 (C.D. Cal. May 9, 2024) ("But even where a defendant is arguably motivated by monetary gain, the crime-tort exception may nonetheless apply if plaintiffs have adequately alleged that the defendant's conduct violated state law"). And none of the ECPA cases on which Mount Sinai relies in advancing this improbable theory involved alleged violations of HIPAA (or like statutes criminalizing disclosure of private information for commercial purposes). *See In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *18 n.13 (alleged interception of Gmail messages); *Rodriguez*, 2021 WL 2026726, at *6 n.8 (alleged interception of communications with company's software

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

development kit); *Katz-Lacabe v. Oracle Am.*, Inc., 668 F. Supp.3d at 945 (alleged tracking of web browsing activities).

Second, Mount Sinai argues that the FAC does not allege a criminal or tortious purpose on its part, on the ground that it is not proper to infer such intent from a defendant's actions. In so arguing, it relies on *DoubleClick*, in which Judge Buchwald rejected an attempt "to meet § 2511(2)(d)'s 'purpose' requirement by arguing that [Plaintiffs'] six non-Wiretap Act claims against DoubleClick 'plead conduct that has underlying it a tortious purpose and/or that translates into tortious acts." *See* 154 F. Supp. 2d at 515. But the FAC's basis for inferring a criminal purpose here is not merely the fact of Mount Sinai's wiretapping—its interception of Plaintiffs' communications with Mount Sinai's Web Properties. It is also that Mount Sinai's business arrangement with Facebook reveals its intent to profit commercially from exploiting Private Information, in violation of HIPAA. These allegations supply an adequate basis on which to infer criminal intent.

***10** In sum, the FAC thus plausibly alleges that the crime-tort exception applies. It thus states a claim under the Wiretap Act.

### B. New York G.B.L. § 349

**[9] [10]** The FAC alleges that Mount Sinai is liable for deceptive consumer acts and practices under New York General Business Law ("NYGBL") § 349. To state a claim under § 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 944 N.Y.S.2d 452, 452, 967 N.E.2d 675 (2012)). A plaintiff must allege actual injury, although that need not take the form of a pecuniary harm. *See Stutman v. Chem. Bank*, 95 N.Y.2d 24, 709 N.Y.S.2d 892, 896, 731 N.E.2d 608 (2000).

The FAC's § 349 claim is based on Mount Sinai's "promising to maintain the privacy and security of Plaintiff's and Class Members' PHI" and "failing to disclose or omitting material facts ... regarding disclosure of [ ] Private Information to Facebook" in its Privacy Policy and HIPAA Privacy Notice. FAC ¶ 448; *see also id.* ¶¶ 449–65. In moving to dismiss, Mount Sinai argues that the FAC fails to allege (1) any deceptive, as opposed to unfair, practice, and (2) that Mount Sinai's deceptive acts, if any, caused an actual injury. Def. Br. at 10–13; Def. Reply at 4–6. These arguments are easily put aside.

Mount Sinai ultimately appears to relent on the first argument, in that it tacitly concedes—as is clearly correct—that the FAC does not pursue a statutorily unavailable theory of "unfair" practices. *See* Def. Reply Br. at 4. And the facts recited above adequately plead what the statute requires for liability, to wit, consumer-oriented conduct that was materially misleading to a reasonable consumer. The FAC pleads, with factual support, that Mount Sinai's Privacy Policy and HIPAA Privacy Notice were flatly false in representing that the hospital would not collect (or share with outsiders like Facebook) patient's confidential personal health data.

**[11]** Mount Sinai, however, contends that privacy injuries are not cognizable under the statute. Def. Reply Br. at 5–6. That is wrong. New York courts have held that a privacy injury can be the basis for a § 349 claim "where confidential, individually identifiable information—such as medical records or a social security number—is collected without the individual's knowledge or consent." *Mount v. PulsePoint, Inc.*, 684 Fed. App'x 32, 35 (2d Cir. 2017) (citing *Meyerson v. Prime Realty Servs., LLC*, 7 Misc.3d 911, 796 N.Y.S.2d 848, 850 (2005)); *Anonymous v. CVS Corp.*, 188 Misc.2d 616, 728 N.Y.S.2d 333, 335 (2001) (deceptive practice of disclosing prescription information to third party injured plaintiffs). The FAC so pleads here. It pleads that Mount Sinai, via the Facebook Pixel, collected confidential, individually identifiable information constituting medical records without the Plaintiffs' knowledge or consent. FAC ¶¶ 456–62. And it pleads that Mount Sinai's deceptive representations that it would not disclose such information to third parties caused the cognizable privacy injury, by inducing Plaintiffs to submit private medical data and thereby lose control of it. *Id.* ¶¶ 461–62. *See, e.g.*, *Stutman*, 709 N.Y.S.2d at 898, 731 N.E.2d 608 (causation adequately pled where complaint alleged that defendant promised there would not be a prepayment charge for loan, but assessed a charge anyhow); *Kane*, 2024 WL 1178340, at *18 (causation pled where relevant provisions of privacy policies deceived plaintiff "into providing [private information] to Defendant").

***11** The FAC thus states a claim under § 349.

### C. New York Common Law Claims

Mount Sinai next moves to dismiss the FAC's New York state common law claims. [11]

**1. Negligence**

**[12]** Mount Sinai argues that the FAC's negligence claim must be dismissed because the FAC, while alleging negligent conduct, *see* FAC ¶¶ 371–80, alternatively alleges Mount Sinai's willful, knowing, and/or intentional conduct, *id.* ¶¶ 381–94. *See* Def. Br. at 14–15. That is wrong. Under Federal Rule of Civil Procedure 8, a complaint may plead in the alternative, in this case, by alleging intentional and negligent conduct on Mount Sinai's part. *See, e.g.*, *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 406–07 (S.D.N.Y. 2001) ("Rule 8(e) permits a plaintiff to make two or more 'statements of a claim' alternatively.... In addition, plaintiffs may state as many separate claims as they have regardless of consistency."); *Henry v. Daytop Village, Inc.*, 42 F.3d 89, 95–96 (2d Cir. 1994) ("Pursuant to Rule 8(e)(2) ... we may not construe Henry's first claim as an admission against another alternative or inconsistent claim."). The claim that Mount Sinai failed to take due care not to violate the law by divulging Plaintiffs' private health information, *see* FAC ¶¶ 371–80, may thus stand alongside the claim that Mount Sinai intentionally interfered with Plaintiffs' "interest in solitude and/or seclusion," *id.* ¶¶ 381–94. And the FAC pleads a factual basis for the negligence claim, as it must. *See In re Livent, Inc.*, 151 F. Supp. 2d at 407 (claim pled in alternative "must be sufficient standing on its own."). Mount Sinai does not dispute that point. *See* Def. Br. at 15 (quoting FAC ¶ 373).

Mount Sinai does argue that, because the FAC incorporates by reference in this claim its factual allegations of intentional conduct, its negligence claim is deficient. Def. Reply Br. at 6–7 (noting that FAC ¶ 371 commences its pleading of the negligence claim by "repeat[ing] and realleg[ing]" each preceding factual allegation). Mount Sinai does not cite any legal authority for dismissal on that basis. And its bid for dismissal on that asserted technicality is inconsistent with a plaintiff's established right under Rule 8(e) to plead inconsistent claims in the alternative.

**2. Breach of Implied Contract; Breach of Fiduciary Duty; Breach of Confidence; Constructive Bailment; Implied Covenant of Good Faith & Fair Dealing**

Mount Sinai next argues that the FAC's claims of breach of implied contract, FAC ¶¶ 406–12, breach of fiduciary duty, *id.* ¶¶ 413–20, breach of confidence, *id.* ¶¶ 421–28, constructive bailment, *id.* ¶¶ 429–37, and breach of the implied covenant of good faith and fair dealing, *id.* ¶¶ 438–46, all duplicate, and must be dismissed in favor of, a claim for breach of physician-patient confidentiality. Def. Br. at 15–17. That argument fails.

**[13]** The FAC does not bring a claim for breach of physician-patient confidentiality. New York courts have recognized a common-law cause of action arising from a physician's breach of doctor-patient confidentiality. *See Fedell v. Wierzbieniec*, 127 Misc.2d 124, 485 N.Y.S.2d 460, 461–62 (1985), *aff'd*, 116 A.D.2d 990, 498 N.Y.S.2d 1013 (1986) (recounting history of this cause of action). But the FAC does not claim this tort. The legal principle commanding—in some circumstances—the dismissal of a claim as duplicative of another based on the same facts and seeking the same relief, *see, e.g.*, *IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 40 N.Y.3d 277, 197 N.Y.S.3d 719, 728–29, 220 N.E.3d 646 (2023) (where plaintiffs bring a tort claim based on a theory, also pursued, of contract damages, the tort claim should be dismissed as duplicative); *Campbell v. Whole Foods Mkt. Grp., Inc.*, 516 F. Supp. 3d 370, 393–94 (S.D.N.Y. 2021) (claim for unjust enrichment should be dismissed where duplicative of other claims), thus does not apply here.

***12** In any event, even had the FAC pursued a claim for breach of physician-patient confidentiality, it is not clear that such would require dismissal of the other common-law claims as duplicative. Mount Sinai cites cases that it contends support that dismissal of other claims in favor of the complaint's more "appropriate" physician-patient confidentiality-breach claim. *See* Def. Br. at 15–17 (citing *MacDonald v. Clinger*, 84 A.D.2d 482, 446 N.Y.S.2d 801 (1982); *Fedell*, 485 N.Y.S.2d 460). But these holdings either turn on comparisons between the claims pled in those cases, which led the court to find that the physician-patient claim alone adequately captured the injury alleged and supported the damages sought, or consist of theoretical discussions of the claims available to a New York plaintiff. *See MacDonald*, 446 N.Y.S.2d at 804 (pure breach of contract action would not fully capture injury caused by a breach of a doctor's duty of confidentiality); *Fedell*, 485 N.Y.S.2d at 462 (holding claim of breach of doctor-patient confidentiality most appropriate in case where plaintiff's doctor in personal injury lawsuit allegedly wrongfully gave defense confidential information about plaintiff). With no such claim pled here, the Court is ill-equipped to say whether such a claim, if pled, would necessarily be held more appropriate than the common claims that Plaintiffs do plead. And Mount Sinai has not cited cases dismissing common law

claims of the nature at issue here (breach of implied contract, breach of fiduciary duty, breach of confidence, constructive bailment, and breach of the implied covenant of good faith and fair dealing) as duplicative of a claim for breach of doctor-patient confidentiality.

Mount Sinai, finally, contends that the FAC does not plead facts sufficient to support a claim of a breach of physician-patient confidentiality because, *inter alia*, it does not tie its claims to any particular physician, and thus the information at issue can not necessarily be viewed as from a "patient." Def. Br. at 17–20. That argument is a non-starter as there is no such claim to dismiss. If anything, Mount Sinai's discussion may help explain Plaintiffs' decision not to claim such a tort.

Accordingly, the Court denies Mount Sinai's motion to dismiss the above common-law claims.

### 3. Unjust Enrichment

Finally, Mount Sinai moves to dismiss the FAC's claim for unjust enrichment (1) as duplicative of its implied contract claim, and (2) because it does not adequately allege that Mount Sinai was enriched at Plaintiffs' expense. Def. Br. at 20–22.

**[14]** **[15]** **[16]** Unjust enrichment "lies as a quasi-contract claim" that "contemplates 'an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties.' " *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 950 N.Y.S.2d 333, 336, 973 N.E.2d 743 (2012) (citation omitted). But "unjust enrichment is not a catchall cause of action to be used when others fail." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 944 N.Y.S.2d 732, 740, 967 N.E.2d 1177 (2012). The claim "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Id.* "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Id.*

**[17]** Here, the conduct underlying the FAC's unjust enrichment claim is the same underlying its implied contract claim (and its other tort claims). All are based on Mount Sinai's allegedly wrongful collection and disbursement of Plaintiffs' confidential medical information. *See* FAC ¶¶ 413–20 (alleging unjust enrichment on the basis that "Plaintiffs and Class Members conferred a benefit upon Mount Sinai in the form of the monetizable Private Information that Mount Sinai collected from them and disclosed to third parties, including the Pixel Information Recipients, without authorization and proper compensation").

**[18]** The FAC does appear to plead distinct damages arising from this claim, insofar as the claim contends that, having unjustly profited from the mining and sale of Plaintiffs' data, Mount Sinai should have to "disgorge into a common fund for the benefit of Plaintiffs and the Class." *Id.* ¶ 420. "But the opportunity for plaintiffs to glean a larger damage award does not distinguish the violative conduct alleged under the rubric of unjust enrichment from that underlying the other claims." *Patellos v. Hello Prods., LLC*, 523 F. Supp. 3d 523, 537–38 (S.D.N.Y. 2021) (dismissing unjust enrichment claim as duplicative of other tort and contract claims despite fact that damages on unjust enrichment claim alone could have entailed disgorgement of defendants' total revenue on sales of a product).

***13** The Court accordingly dismisses this claim as duplicative. *See, e.g.*, *Emps. Ins. v. Zemlyansky*, No. 13 Civ. 4966 (MKB) (SMG), 2015 WL 5692899, at *2 (E.D.N.Y. Sept. 27, 2015) ("[A]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." (internal alteration omitted)); *Cont'l Cas. Co. v. Contest Promotions NY, LLC*, No. 15 Civ. 501 (MKB), 2016 WL 1255726, at *3–4 (E.D.N.Y. Mar. 28, 2016) (denying motion for default judgment where unjust enrichment claim duplicative of breach of contract claim).

## CONCLUSION

For the forgoing reasons, the Court denies Mount Sinai's motion to dismiss except as to the FAC's unjust enrichment claim, which the Court dismisses as duplicative, and its claim for invasion of privacy, which is dismissed on consent. In a separate order today, the Court will schedule an initial pre-trial conference.

SO ORDERED.

### All Citations

--- F.Supp.3d ----, 2024 WL 3586357

## Footnotes

1 The underlying facts which form the basis of this decision are drawn from the FAC. Dkt. 16. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For the purpose of resolving a motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiff, *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

2 Although Mount Sinai owns its website, it licenses its MyChart patient portal from Epic Software Systems, a privately-owned healthcare software company. FAC ¶ 1, n.3.

3 As listed by Mount Sinai, these exceptions include:

> Treatment; Payment; Business operations; Appointment reminders, treatment alternatives, benefits and services; Fundraising ("We will not sell your PHI without your authorization."); Business associates ("we will have a written contract with them that requires the BA and any of its subcontractors to protect the privacy of your PHI. They and their subcontractors are independently required by federal law to protect your information."); In-Patient Directory; Family and friends involved in your care; As required by law; Public health activities; Victims of abuse, neglect or domestic violence; Health oversight activities, Product monitoring, repair and recall; Lawsuits and disputes; Law enforcement; To avert a serious and imminent threat to health or safety; National security and intelligence activities or protective services; Military and veterans; Inmates and correctional institutions; Workers' compensation; Coroners, medical examiners and funeral directors; Organ and tissue donation; Research; Completely de-identified of partially de-identified information; Incidental disclosures ("While we will take reasonable steps to safeguard the privacy of your PHI, certain disclosures of your PHI may occur during or as an unavoidable result of our otherwise permissible uses or disclosures of your PHI").

FAC ¶ 151.

4 HIPAA's Privacy Rule, codified in 42 U.S.C. § 1320, requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect privacy of PHI and set limits and conditions on the disclosure of PHI. FAC ¶ 161. Of the approximately 18 HIPAA "identifiers" that are considered PII, those relevant here are names, dates related to an individual, email addresses, device identifiers, web URLs, and IP addresses. *Id.* ¶¶ 204–05. The statute states that a "person ... shall be considered to have obtained or disclosed individually identifiable health information ... if the information is maintained by a covered entity ... and the individual obtained or disclosed such information without authorization." *Id.* ¶ 166. Violation of 42 U.S.C. § 1320(d)(6) is subject to criminal penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." *Id.* ¶ 167.

5 In a putative class action, to survive a motion to dismiss, the complaint must state a claim based on the facts alleged as to the named plaintiffs, not the putative class. *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007).

6 Both parties have since filed notices of supplemental authority and responses to each other's notices. Dkts. 22–26.

7 There is a division of authority whether the party exemption applies when defendants receive communications via third-party tracking devices that simultaneously duplicate and forward GET requests. *Compare In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) (simultaneous duplication and forwarding of GET requests does not qualify for the party exemption), *with In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 142–43 (3d Cir. 2015) (simultaneous duplication and forwarding of GET requests does qualify for the party exemption). That issue is not implicated here because, as pled, Mount Sinai controlled and maintained its Web Properties.

8 The Court puts aside as ill-pled the FAC's separate theory of criminality: that Mount Sinai engaged in a "scheme or artifice to defraud," FAC ¶ 366, by placing "the 'fbp' cookie on patient computing devices disguised as a first-party cookie on Mount Sinai's Web Properties rather than a third-party cookie from Meta." *Id.* ¶¶ 367–68. Mount Sinai argues that these fail Rule 9(b)'s standard for pleading fraud. Def. Br. at 10. It is not clear that Rule 9(b) applies here. It requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," but it states that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Regardless, the FAC's theory of fraud fails, because there is no statutory basis to find the § 2511(2)(d) exception inapplicable to fraudulently induced communications. *See In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 143 (3d Cir. 2015) ("Though we are no doubt troubled by the various deceits alleged in the complaint, we do not agree that a deceit upon the sender affects the presumptive non-liability of parties under § 2511(2)(d)."); *Clemons v. Waller*, 82 F. App'x 436, 441 (6th Cir. 2003) (rejecting theory that defendant's "use of fraud and deceit vitiated his claim to be a party to the communication."); *United States v. Pasha*, 332 F.2d 193, 198 (7th Cir. 1964) ("We believe that impersonation of the intended receiver is not an interception within the meaning of the statute."); *see also Caro*, 618 F.3d at 100.

The Court also puts aside the FAC's allegation that Mount Sinai had a tortious purpose to invade patients' privacy. FAC ¶ 357. The FAC pleads that New York law applies to all Plaintiffs (and the putative class). FAC ¶ 333. Under New York law, that is insufficient to trigger the crime-tort exception. Invasion of privacy is a common law tort that may satisfy the crime-tort exception. *Caro*, 618 F.3d at 100 ("The only tort [plaintiff] asserts in his complaint that could plausibly provide the intent necessary to bring the recording under the Wiretap Act is invasion of privacy, a tort recognized under Connecticut common law."). But New York law does not recognize a legal claim for invasion of privacy. *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115, 123, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993) ("[I]n this State, the right to privacy is governed exclusively by section 50 and 51 of the Civil Rights Law; we have no common law of privacy."); *see also Burke v. Dollar Tree Stores, Inc.*, 2022 WL 15523465, at *4 (W.D.N.Y. Oct. 27, 2022) ("New York does not recognize a common law right to privacy claim."). Presumably for this reason, Plaintiffs, in the course of briefing this motion, withdrew their common-law claim of invasion of privacy. Pl. Br. at 18 n.11.

9 *See, e.g., In re Grp. Health Plan Litig.*, 2023 WL 8850243, at *8 ("While Plaintiffs have alleged [Defendant's] motivations, determination of [Defendant's] actual purpose ... requires a factual undertaking. Plaintiffs, without the benefit of discovery, have met the pleading requirements to plausibly allege the crime-tort exception applies."); *Kane v. Univ. of Rochester*, 2024 WL 1178340, at *8 ("Defendant may be able to show that, as a factual matter, that they did not intercept Plaintiffs' communications for that purpose. But at this stage of the proceedings, Plaintiffs, without the benefit of discovery, have plausibly alleged that the tort-crime exception applies."); *cf. In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778 (N.D. Cal. 2022) (declining to issue preliminary injunction but noting that "[t]here is a not-insignificant chance, then, that plaintiffs may be able to show that the crime-tort exception applies.").

10 Where the defendant acted with such a motive in disclosing individually identifiable health information, HIPAA makes such a crime. 42 U.S.C. § 1320d-6.

Cooper v. Mount Sinai Health Systems, Inc., --- F.Supp.3d ---- (2024)
2024 WL 3586357

11 Plaintiffs, in their response brief, have withdrawn the FAC's claim for invasion of privacy. Pl. Br. at 18 n.11. The Court dismisses that claim on consent.

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

2024 WL 4203263
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dolores GAY and Corrine Jacob, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
GARNET HEALTH, Defendant.

23-cv-06950 (NSR)
|
Signed September 16, 2024

**Attorneys and Law Firms**

Dylan J. Gould, Terence Coates, Markovits Stock & DeMarco, LLC, Cincinnati, OH, Glen Lawrence Abramson, Milberg Coleman Bryson Phillips Grossman PLLC, Knoxville, TN, Philip Joseph Krzeski, Chestnut Cambronne PA, Minneapolis, MN, Victoria Jennings Maniatis, Milberg Coleman Bryson Phillips Grossman PLLC, Garden City, NY, for Plaintiffs.

Robyn Mara Feldstein, Baker & Hostetler, LLP, New York, NY, David Alan Carney, Baker & Hostetler, LLP, Cleveland, OH, for Defendant.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

***1** Plaintiffs Dolores Gay ("Gay") and Corrine Jacob ("Jacob"), on behalf of themselves and all others similarly situated ("Plaintiffs"), initiated this action on August 7, 2023 (ECF No. 1), alleging violations of the Electronic Communications Privacy Act 18 U.S.C. § 2511(1) ("ECPA"), New York Civil Rights Law §§ 50, 51, New York Consumer Law General Business Law § 349, as well as bringing common law claims of breach of fiduciary duty/confidentiality, breach of implied contract, unjust enrichment and negligence against Garnet Health ("Garnet" or "Defendant").

Presently before the Court is the Defendant's Motion to Dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Defendant's Motion to Dismiss is DENIED IN PART and GRANTED IN PART.

**BACKGROUND**

The following facts are derived from the Complaint and are taken as true and construed in the light most favorable to the Plaintiffs at this stage.

Plaintiffs Dolores Gay and Corine Jacob bring this action as individuals and on behalf of all others similarly situated against Garnet. Plaintiffs are current patients of Garnet. (Compl. ¶¶ 35, 47.) Garnet is a not-for-profit New York corporation. (*Id.* ¶ 59.) Defendant is headquartered at 706 East Main Street, Middletown, New York 10940. (*Id.*) Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996. (*Id.* ¶ 62.) Defendant is a provider of healthcare services to approximately 450,000 patients across Orange, Sullivan and Ulster Counties, and has over 4,000 healthcare professionals and 850 medical staff members. (*Id.* ¶ 61.)

Defendant owns and operates the website https://www.garnethealth.org/, along with the Garnet Health MyChart Account portal (collectively, the "Website"), which is accessible from Garnet's website. Plaintiffs use the Website to obtain information about different conditions and treatment opportunities, Defendant's locations and the available clinicians at each location, and the services offered to patients. (*Id.* ¶ 2.) Patients are also able to use a search bar on the Website where they can enter questions, symptoms, conditions, clinician names and other queries to obtain responsive information. (*Id.*) Patients also access their MyChart Patient Account through the Website; the MyChart Patient Account contains the patient's personally identifiable information ("PII") and protected health information ("PHI") (together, "Private Information").

Defendant installed the Facebook Tracking Pixel ("Pixel") on its Website. (*Id.* ¶ 2.) The Pixel enables the transmission of Plaintiffs' and Class Members' PII and PHI. (*Id.*) Defendant also allegedly installed the Facebook Conversion Application Programming Interface ("Conversions API") on its Website. (*Id.* ¶ 4.) By doing so, Defendant facilitated additional unauthorized transmission of Plaintiffs' and Class Members' PII and PHI. (*Id.* ¶ 5.) Where the Tracking Pixel and Conversions API are installed on Defendant's Website, the information Plaintiffs submit through use of Defendant's Website is unlawfully disclosed to Facebook alongside the Plaintiffs' unique and persistent Facebook ID ("FID"). (*Id.*

¶¶ 7-8.) The Pixel communicates directly to Facebook from the Defendant's Website. (*Id.* ¶ 10.) The Pixel share's the user's Facebook User ID through a "cookie" Facebook stores whenever an individual accesses their Facebook account from the same web browser. (*Id.* ¶ 11.) Similarly, the Conversion API allows the Defendant to send information from their Webpage to Facebook. (*Id.* ¶ 14.) Defendant stores Plaintiffs' PII and PHI on its own server and then communicates this information to Facebook. (*Id.* ¶ 15.) Plaintiffs' activity on the Website is tracked by Conversion API and then transmitted directly to Facebook. (*Id.* ¶ 19.) From there, Facebook sells Plaintiffs' private information to third parties. (*Id.* ¶ 22.)

***2** As an example, Plaintiffs made use of Defendant's Website to schedule appointments, communicate with doctors, complete patient web forms, and review medical and billing records. (*Id.* ¶ 23.) Afterwards, this information was transmitted from Defendant's Website to Facebook. (*Id.* ¶ 24.) Thereafter, Plaintiffs saw targeted ads tailored to the information transmitted by Defendant. (*Id.* ¶¶ 46, 58). Plaintiffs assert that Defendant utilized Facebook Pixel and Conversions API knowing that Plaintiffs' PHI and PII would be transmitted to Facebook. (*Id.* ¶ 30.) Consequently, Plaintiffs allege suffering injury as a result: invasion of privacy, lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Pixel, loss of benefit of the bargain, diminution of value of the Private Information, statutory damages and the continued and ongoing risk to their Private Information. (*Id.* ¶ 33.)

## PROCEDURAL HISTORY

On August 7, 2023, Plaintiffs commenced this action against Defendant in its complaint ("the Complaint".) (ECF No. 1.) On December 29, 2023, Defendant filed a motion to dismiss and its memorandum of law in support (the "Motion" or "Mot.", ECF Nos. 20 and 21.) Plaintiffs filed an opposition to the Motion (the "Opposition" or "Opp.", ECF No. 23.) The Defendant also filed a reply in further support of the Motion (the "Reply", ECF No. 24.)

## LEGAL STANDARD

### A. Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). The Second Circuit "deem[s] a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference ... and documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rotham v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (internal citations omitted). The critical inquiry is whether the Plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

Plaintiffs bring claims pursuant to Electronic Communications Privacy Act 18 U.S.C. § 2511(1) ("ECPA"), New York Civil Rights Law §§ 50, 51, New York Consumer Law General Business Law § 349, as well as common law claims of breach of fiduciary duty/confidentiality, breach of implied contract, unjust enrichment and negligence. Plaintiffs' claims of negligence, unjust enrichment, and breach of implied contract must be dismissed. The Motion to Dismiss is denied as to Plaintiffs' claims under the ECPA, New York Civil Rights Law, New York Consumer Law General Business Law and Plaintiffs' breach of fiduciary duty/ confidentiality claim.

### A. Electronic Communications Privacy Act, 18 U.S.C. § 2511(1) *et seq.*

For an ECPA claim to survive a motion to dismiss based on the one-party consent rule, the Plaintiff must make sufficient allegations that "support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is independent from the intentional act

of recording." *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010). The criminal or tortious purpose exception is to be construed narrowly. *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013)

***3** Plaintiffs are able to survive this threshold. Plaintiffs did not consent to the interception, but one-party consent is sufficient under the ECPA. *Kwok Sze v. Pui-Ling Pang*, No. 15-CV-447 CS, 2015 WL 6867134, Note 3 (S.D.N.Y. Nov. 9, 2015) (noting that § 2511(1) allows for interceptions with one-party consent). Where Defendant's conduct became problematic is where it intended to transmit Plaintiffs' PHI and PII without Plaintiffs' consent for commercial purposes. (Compl. ¶ 215.) Through the alleged use of the Pixel and Conversion API, "Defendant's [interception] of patient communications [ ] were used and disclosed to Facebook and Google ... for purposes of committing criminal and tortious acts in violation of ... HIPAA, 42 U.S.C. § 1320d-6 ("HIPAA")." (*Id.* ¶ 216.) HIPAA makes it a criminal violation to disclose individually identifiable health information to another person without the patient's consent. 42 U.S.C. § 1320d-6. The Complaint alleges that Defendant's use of Pixel and Conversion API was to "track and utilize Plaintiffs' and Class Members PHI and PII for financial gain," in violation of applicable laws such as HIPAA.

Plaintiffs' Complaint explicitly asserts that Defendant's interception and transmitting of Plaintiffs' PHI and PII was for the purpose of "increase[ing] its profit margins" and for "financial gain." (Compl. ¶ 209.) The Complaint sufficiently alleges an independent action secondary to the interception; Plaintiff states that Defendant used and accessed Plaintiffs' and Class Members' data *to* "send identifiers and the content of communications with Defendant simultaneously to Defendant and Facebook, Google, and others." (*Id.* ¶ 222.) By inserting various programs, the Defendant "commanded Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others." (*Id.* ¶ 227.)

Similar allegations have been found to be sufficient to invoke the criminal or tortious exception to the one-party consent rule under the ECPA. *See Cooper v. Mount Sinai Health Sys., Inc.*, No. 23 CIV. 9485 (PAE), 2024 WL 3586357 (S.D.N.Y. July 30, 2024). Here, the Court denied a motion to dismiss by Defendant Mount Sinai against Plaintiff Ronda Cooper. Cooper argued that Mount Sinai intercepted their communications – user activity on Mount Sinai's Web Properties. Mount Sinai was a party to the communication, therefore requiring the crime-tort exception to apply in order for Mount Sinai to be liable under the ECPA. Cooper sought to invoke the exception, arguing "Mount Sinai intercepted their communications with the purpose of disclosing them to Facebook and other third parties without Plaintiffs' consent 'in violation of the laws of the United States and New York.' " *Id.* at *6. Cooper alleged that "Mount Sinai disclosed Plaintiffs' names, emails, computer IP addresses, device identifiers, web URLs, and the days on which they sought treatment, as well as the services they selected and their patient statuses, medical conditions, treatments, and provider and appointment information." *Id.* at *7. Subsequently, "Plaintiffs thereafter received targeted ads on Facebook keyed to their confidential health conditions." *Id.* The Court therefore concluded this sufficiently pled that "at least some information transmitted was individually identifiable health information." *Id.*

Mount Sinai, similar to Garnet, installed a Pixel to its webpage throughout "a multistep process that must be undertaken by the website owner." *Id.* The complaint alleged that "Mount Sinai routinely sent Facebook individually identifiable information that Plaintiffs had entered into Mount Sinai's Web Properties." *Id.* The Court found that Mount Sinai "engaged in such disclosures knowingly and deliberately." *Id.* at *8. As a result, the Court declined to grant the motion to dismiss the ECPA claim, finding that the complaint plausibly supported the inference that "Mount Sinai, for commercial ends, intentionally disclosed individually identifiable patient health information, and thus violated HIPAA, which makes it a crime for a health care provider to disclose individually identifiable health information for commercial gain." *Id.*

***4** The Court finds *Cooper* instructive. Like Mount Sinai, Garnet installed a Pixel (the Facebook Tracking Pixel) as well as the Facebook Conversions Application Programming Interface ("Conversion API") on its website. (Compl ¶¶ 3, 4.) Like Mount Sinai, Garnet "routinely sent Facebook [and Google] individually identifiable information that Plaintiffs had entered into [Garnet Health's] Web Properties" in violation of applicable law such as HIPAA. *Cooper*, 2024 WL 3586357 *8. According to the Complaint, this information included "medical treatment sought, the particular health condition, and the fact that the individual attempted to or did book a medical appointment." (Compl. ¶ 21.) Plaintiff Corinne Jacob alleged that she "used Defendant for a breast biopsy procedure" and that "[s]ubsequent to visiting Defendant's Website to view her test results, Plaintiff began

seeing advertisements related to the treatment of breast cancer." (*Id.* ¶ 46.) Plaintiff Dolores Gay similarly alleged that after using the Defendant's website she has "seen numerous targeted advertisements on Facebook related to her medical conditions and treatments sought through Garnet Health." (*Id.* ¶ 58.) Thus, as was the case in *Cooper*, this dynamic evidences an intent on Garnet's part to commit tortious or unlawful conduct at the time of interception as required to state an ECPA claim, making the application of the criminal or tortious conduct exception applicable. *Cooper*, 2024 WL 3586357, *8. *Kane*, like *Cooper*, significantly overlaps with the facts before the Court presently, further counseling against dismissal of Plaintiffs' ECPA claim.

Further caselaw supports rejecting Garnet's efforts to dismiss Plaintiffs' ECPA claim. Paralleling *Cooper*, in *Kane v. Univ. of Rochester*, No. 23-CV-6027-FPG, 2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024) the Court denied a motion to dismiss an ECPA claim with similar allegations to Plaintiffs'. Therein, the *Kane* Plaintiffs used the University of Rochester's website to search for, make appointments with and communicate with healthcare providers. *Id.* at *1. Plaintiffs alleged that the University of Rochester used two web tracking products (the same before the Court presently), the Facebook Tracking Pixel and the Conversions Application Program Interface. Plaintiffs alleged that the University of Rochester transmitted their personally identifiable information and non-public health information to Facebook without consent. *Id.* The Court therefore concluded that "Plaintiffs can invoke the tort-crime exception. Plaintiffs have alleged that Defendant configured the Pixel to collect and disclose, among other things, that a specific user booked an appointment and the search terms that the user entered to find that provider ... [that information] would be associated with a particular Facebook User ... They have further alleged that Defendants disclosed this information to enhance its marketing efforts... Accordingly, Plaintiffs have plausibly alleged that Defendant's purpose was to commit an act that is punishable as a crime under 42 U.S.C. § 1320d-6: knowingly disclose [individually identifiable health information] without authorization for marketing purposes." *Id.* at 7.

Courts in other circuits have likewise declined to dismiss ECPA claims based around criminal or tortious use of private and protected data relating to patient's medical care. *See Mekhail v. N. Mem'l Health Care*, No. 23CV00440KMMTNL, 2024 WL 1332260, *5 (D. Minn. Mar. 28, 2024). Here, the Court denied Defendant's motion to dismiss where Plaintiff alleged the interceptions were made to access and monetize her private and protected health data, noting that the Plaintiff "sufficiently plead an interception made with the purpose of violating one or more laws, independent of the act of interception itself". The Court further stated that "the parties require discovery to determine whether [the Defendant's] actions do, in fact, constitute conduct required to invoke the crime-tort exception. But at this stage, [Plaintiff's] ECPA [ ] claims may proceed." *Id.* at *5. *See also Kurowski v. Rush Sys. for Health*, No. 22 C 5380, 2023 WL 8544084, *3 (N.D. Ill. Dec. 11, 2023) (denying motion to dismiss where Plaintiff alleged that defendant knowingly transmitted metadata for the purpose of financial gain and that such allegations were "sufficient to invoke the HIPAA [criminal or tortious] exception-to-the-party exception" for a Wiretap Claim).

Therefore, considering *Cooper* and *Kane*, as well as precedent in other circuits, the Court finds that Plaintiffs have sufficiently stated a claim under the ECPA 18 U.S.C. § 2511(1). It may be discovery reveals that Defendant had neither a criminal nor tortious intent, but at the motion to dismiss stage Plaintiffs have met their burden for their ECPA claim to survive.

### B. Breach of Fiduciary Duty/Confidentiality and Negligence

***5** The elements of a breach of fiduciary duty/confidentiality claim under a physician-patient are: (1) existence of physician-patient relationship; (2) the physician's acquisition of information relating to the patient's treatment or diagnosis; (3) the disclosure of such confidential information to a person not connected with the patient's medical treatment, in a manner that allows the patient to be identified; (4) lack of consent for that disclosure; and (5) damages. *See Chanko v. Am. Broad. Cos. Inc.*, 27 N.Y.3d 46, 53-54 (2016). To state a negligence claim, "a plaintiff must demonstrate that the defendant owed plaintiff a duty and breached it, and that his injury proximately resulted from that breach." *Gewirtz v. City of New York*, 196 N.Y.S.3d 683, 687 (N.Y. Sup. Ct. 2023).

Plaintiffs' negligence claim is subsumed within Plaintiffs' claim of breach of fiduciary/confidentiality. Regarding their negligence claim, Plaintiffs allege that "Defendant owed Plaintiffs and Class Members a duty to keep their Private Information completely confidential, and to safeguard sensitive personal and medical information." (*Id.* ¶ 267.) Plaintiffs assert that Defendant breached this duty because "[c]ontrary to its duties as a medical provider and its

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

express promises of confidentiality, Defendant installed its Pixel and Conversion API to disclose and transmit to third parties Plaintiffs' and Class Members' communications with Defendant, including Private Information and the contents of such information." (*Id.* ¶ 269.) The Complaint, as written, does not differentiate between Defendant's legal duty as a healthcare provider and an independent legal duty of care. *Cf Smith v. Home Depot U.S.A., Inc.*, No. 2:20-CV-4125 (DRH) (AKT), 2021 WL 4904572 (E.D.N.Y. Oct. 21, 2021) (declining to dismiss negligence claim as duplicative where the Complaint differentiated between the Defendant's legal duty under contract and independent legal duty of care). The harm Plaintiffs allege for their breach of fiduciary duty/confidentiality claim under the physician-patient relationship and harm Plaintiffs allege for their negligence claim are identical. (Compl. ¶¶ 193, 272.) Such identicality "further demonstrate[s] that these claims are duplicative." *See Beck v. Metro. Bank Holding Corp.*, No. 2:23-CV-07564 (NJC) (ARL), 2024 WL 3849461, *18 (E.D.N.Y. Aug. 16, 2024) (granting motion to dismiss where negligence claim was duplicative of breach of contract claim, noting that the damages asserted between the two claims were the same).

Just as in *Beck*, where the court dismissed a negligence claim as duplicative of a breach of contract claim, here the Court finds Plaintiffs' negligence claim to be duplicative of Plaintiffs' breach of fiduciary duty/confidentiality claim and is dismissed without prejudice. Plaintiffs may amend their complaint to more specifically allege the legal duty owed to Plaintiffs by Defendant independent of the physician-patient relationship, and to allege any differentiating harm Plaintiffs have allegedly suffered.

Regarding Plaintiffs' breach of fiduciary/confidentiality claim, the Court finds that Plaintiffs have successfully stated such claim. Jacob and Gay both assert they are patients of the Defendant. (Compl. ¶¶ 36, 48.) Defendant acquired information relating to Jacob and Gay's treatment and/or diagnosis. (*Id.* ¶¶ 37-40, 49-52.) Because of Defendant's alleged use of the Pixel and Conversion API, confidential information related to Plaintiffs' treatment was transmitted to a party not connected to Plaintiffs' medical treatment (*e.g.*, Facebook) in a manner that allowed the patient to be identified. (*Id.*¶ 85.) Plaintiffs did not consent to this disclosure. (*Id.* ¶¶ 42, 54.) Plaintiffs allege they have suffered harm, namely: "a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private; b. Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements; c. Defendant eroded the essential confidential nature of the provider-patient relationship; d. General damages for invasion of their rights in an amount to be determined by a jury; e. Nominal damages for each independent violation; f. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data; g. Plaintiffs and Class Members did not get the full value of medical services for which they paid, which included Defendant's duty to maintain confidentiality; h. Defendant's actions diminished the value of Plaintiffs' and Class Members' Private Information; and i. Defendant's actions violated property rights Plaintiffs and Class members have in their private information." (*Id.* ¶ 193.) Accordingly, Plaintiffs have successfully stated a breach of fiduciary duty/confidentiality claim.

**C. Invasion of Privacy, New York Civil Rights Law §§ 50, 51**

***6** Plaintiffs have withdrawn their Invasion of Privacy claim arising under New York Civil Rights Law §§ 50, 51. (Opp., note 3). Accordingly, Count III of Plaintiffs' Complaint is dismissed with prejudice.

**D. Breach of Implied Contract**

"A contract may be implied in fact where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." *Matter of Boice*, 640 N.Y.S.2d 681, 683 (1996). Plaintiffs allege that when they provided their PHI and PII to Defendant "they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their private information without their consent." (Compl. ¶ 253.) Earlier on in their complaint, Plaintiffs reference Defendant's Notice of Privacy Practices, which states that "use and disclosure of your medical information for marketing purposes or involving a sale of your information will be made only with your written authorization." (*Id.* ¶ 135.)

However, absent from the Complaint is that Plaintiffs viewed Defendant's NOPP in deciding whether to engage Defendant's services. For a contract to be formed, there must be mutual assent. *See Virgilio Trailer Corp. v. Ferrandino & Son, Inc.*, 184 N.Y.S.3d 385, 387 (2023). Plaintiff cannot have assented to assurances described in the NOPP if they did not view the Defendant's policies at the time of contract formation. *Id.* Accordingly, Plaintiffs cannot state a claim for breach

of implied contract at this time. Plaintiffs may amend their complaint to allege sufficient details indicating Plaintiffs, at the time of contract formation, was aware of these provisions and assented to them.

**E. Unjust Enrichment**

To state a claim for unjust enrichment, the claimant must allege (1) the other party was enriched, (2) at the party's expense and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered. *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (2012).

The Complaint does allege that Defendant made use of Plaintiffs' PII and PHI. (Compl. ¶¶ 262-264.) Defendant was enriched by the disclosure of Plaintiffs' information because "[i]n exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook in the form of enhanced advertising services and more cost-efficient marketing on Facebook." (*Id.* ¶ 162.) Plaintiffs allege they have suffered due to Defendant's conduct because they were not compensated for use of their Private Information. (*Id.* ¶ 264.) Plaintiffs demand that Defendant should be "compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds." (*Id.* ¶ 265.) While such allegations are necessary for an unjust enrichment claim, they are not sufficient. The unjust enrichment claim duplicates Plaintiffs' breach of fiduciary duty/breach of confidentiality in its allegations around use of Plaintiffs' private data and the alleged damages suffered. (*Id.* ¶¶ 193, 261-262.) "An unjust enrichment claim is not available where it simply duplicates or replaces a conventional contract or tort claim." *See Carovillano v. Sirius XM Radio Inc.*, No. 23 CIV. 4723 (PAE), 2024 WL 450040, *13 (S.D.N.Y. Feb. 6, 2024) (internal citations omitted). Here, Plaintiffs' unjust enrichment claim duplicates their breach of fiduciary duty/breach of confidentiality claim – a tort claim. *See Fedell v. Wierzbieniec*, 127 Misc. 2d 124, 127 485 N.Y.S.2d 460 (Sup. Ct. 1985), aff'd, 116 A.D.2d 990, 498 N.Y.S.2d 1013 (1986) (recognizing breach of confidence as a tort action and holding other causes of action attempting to duplicate the claim as inappropriate). Thus, Plaintiffs' unjust enrichment claim is dismissed as duplicative without prejudice. *Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 116 (S.D.N.Y. 2021) (dismissing unjust enrichment claim where it was "premised on the same factual allegations as those supporting Plaintiffs' other claims, and Plaintiffs have not alleged distinct damages with respect to this claim"). Plaintiffs may amend their complaint to demonstrate distinct factual allegations and damages to support an unjust enrichment claim.

**F. New York Consumer Law General Business Law § 349**

***7** To state a claim under § 349, "a plaintiff must allege that a defendant engaged in consumer-oriented conduct that was materially misleading and that the plaintiff suffered an injury as a result." *Miguel Frias, Jessica Avilez and Roy Campbell, individually & on behalf of all others similarly situated, Plaintiffs, v. Mars Wrigley Confectionery US LLC, Defendant.*, No. 23 CIV. 4422 (AT), 2024 WL 3988667, *2 (S.D.N.Y. Aug. 28, 2024). A consumer for § 349 is one " 'who purchase[s] goods and services for personal, family or household use.' " *Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 449 (S.D.N.Y. 2004).

Plaintiffs plead that Defendant violated its express policy. *See* (Compl. ¶¶ 132-136.) Specifically, Plaintiffs allege that Defendant misrepresented its privacy and security policy regarding management of patient health information. (*Id.*) Plaintiffs note that Defendant does not inform patients of its actions in transmitting information from Defendant's Website to Facebook. (*Id.*) Given the discrepancy between the policies explicitly articulated by the Defendant and the actual conduct carried out regarding Plaintiffs PHI and PII, at this stage in the case, Plaintiffs have sufficiently alleged that the conduct was materially misleading.

Plaintiffs assert that because of Defendant's misrepresentations, they have "lost money or property in the form [of] monies paid for Defendant's services, diminution in value of their Private Information, as well as loss of the benefit of their bargain with Defendant." (*Id.* ¶ 287.) Defendant's motion to dismiss argues that Gay and Jacob "do not identify any alleged injury that is resulting from Garnet Health's claimed deception." (Mot. p. 9). Per *Miguel Frias*, Plaintiffs can establish injury where they allege they did not receive the full value of her purchase – which can be done by stating that plaintiff would not have purchased the product or been willing to pay as much had they known the true facts. *Miguel Frias*, 2024 WL 3988667, *4. Here, the closest Plaintiffs get to this language is when Plaintiffs state "Plaintiffs and Class Members would not have trusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent. Plaintiffs and Class Members would not have retained Defendant to provide

healthcare services in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent." (Compl. ¶¶ 254-255.) While these allegations are made under Count IV Breach of Implied Contract, Plaintiffs here are clearly stating they would not have purchased the product or service had they known the true facts. This is sufficient for the purposes of pleading injury. *See Pichardo v. Only What You Need, Inc.*, No. 20-CV-493 (VEC), 2020 WL 6323775 (S.D.N.Y. Oct. 27, 2020) (holding that Plaintiff sufficiently pled injury where they asserted that had they known the true facts they would not have purchased the product). Additionally, Plaintiffs allege the "loss of the benefit of their bargain with Defendant." (Compl. ¶ 287.) Plaintiffs here are pleading that they did not receive the full value of their purchased services. Accordingly, Plaintiffs sufficiently alleged that the Defendant materially misrepresented its services offered and that, as a result, they suffered injury. Thus, Plaintiffs have sufficiently pled a claim under New York Consumer Law General Business Law § 349.

## CONCLUSION

***8** For the foregoing reasons, the Court GRANTS the Defendant's motion to dismiss Plaintiffs' Breach of Implied Contract, Unjust Enrichment and Negligence Causes of Action against Defendant without prejudice. Plaintiffs' Invasion of Privacy Claim under New York Civil Rights Law §§ 50 and 51 is dismissed with prejudice. Defendant's motion to dismiss is DENIED as to Plaintiffs' Breach of Fiduciary Duty/Confidentiality, ECPA, and New York General Business Law § 349 claims. Plaintiffs are granted leave to file an Amended Complaint by October 21, 2024. Plaintiffs are advised that the Amended Complaint will replace, not supplement, the Complaint, and so any claims that it wishes to pursue must be included in, or attached to, the Amended Complaint. Should Plaintiffs file an Amended Complaint, the Defendant is directed to answer or otherwise respond by November 12, 2024. If Plaintiffs fail to timely file an Amended Complaint within the time allowed, those claims that were dismissed without prejudice shall be deemed dismissed with prejudice. If no Amended Complaint is timely filed, the Defendant is directed to file an answer on or before October 28, 2024 and the parties are directed to complete and file a Case Management Plan and Scheduling Order by November 11, 2024.

### All Citations

Slip Copy, 2024 WL 4203263

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT C

2024 WL 4350328
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

NANCY MURPHY, et al. Plaintiffs,
v.
THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC. Defendant.

CIVIL ACTION NO. 22-4674
|
Filed 09/30/2024

**MEMORANDUM OPINION**

Rufe, J.

***1** Plaintiffs Nancy Murphy and Robert Stewart filed this proposed class action against Defendant Thomas Jefferson University Hospitals, Inc. ("Jefferson Health") asserting various claims arising out of Defendant's alleged use of Meta Platforms, Inc.'s ("Meta") advertising technology on Jefferson Health's website. Defendant has moved to dismiss these claims. For the reasons explained below, Jefferson Health's motion will be denied.

## I. BACKGROUND

### A. Factual Background [1]

Jefferson Health is a multi-state non-profit health system based in Philadelphia, Pennsylvania. [2] Plaintiffs Nancy Murphy and Robert Stewart have been Jefferson Health patients since before 2018. [3] They have created online accounts with the MyJeffersonHealth online portal and the MyJeffersonHealth Mobile Application to communicate with their doctors and other healthcare professionals and departments about their health conditions. [4] Plaintiffs allege that at the time they used MyJeffersonHealth, Jefferson Health utilized Meta's "tracking and collection tools, including the Meta Pixel, Meta SDK, Meta Conversions API, customer list uploads, social plug-ins, the Meta Graph API, and server-to-server transmissions (collectively, the 'Meta Collection Tools')." [5] Plaintiffs allege that Meta works with healthcare providers, known as healthcare partners, to use these collection tools to sell targeted advertising based on patients' online behavior. [6]

Plaintiffs allege that when a patient uses MyJeffersonHealth, the Meta Collection Tools contemporaneously transmit the following content of their communications to Meta including:

> (1) signing-up for a patient portal; (2) signing-in or -out of a patient portal; (3) taking actions inside a patient portal; (4) making, scheduling, or participating in appointments; (5) exchanging communications relating to doctors, treatments, payment information, health insurance information, prescription drugs, prescriptions, side effects, conditions, diagnoses, prognoses, or symptoms of health conditions; (6) conduct a search on Jefferson Health's web properties; and (7) other information that qualifies as "personal health information" under federal and state laws. [7]

Plaintiffs allege that these tools allow Jefferson Health to intercept individually-identifiable health information ("IIHI") and monetize this information for Jefferson Health's financial gain. [8]

Plaintiffs allege that the information transmitted from Jefferson Health to Meta "always includes information sufficient to uniquely identify a patient under federal law," including IP address information and device identifiers that Meta associates with a patient's Meta account (such as Facebook), and may include:

> ***2** demographic information, email address, phone number, computer ID address, or contact information entered as emergency contacts or for advanced care planning, along with information like appointment type and date, a selected physician, ... and information about the substance, purport, and

meaning of patient requests for information from Jefferson Health. [9]

Plaintiffs allege that Meta collects this information and uses cookies to "match it to Facebook users, allowing Jefferson Health to target advertisements on and off Facebook." [10] Jefferson Health's Notice of Privacy Practices represents that "Jefferson Health understands that information about you and your health is very personal ... [w]e are required by law to maintain the privacy of our patient's protected health information." [11] The Notice also represents that should Jefferson Health disclose personal health information for marketing purposes or where remuneration or a sale occurs, Jefferson Health will obtain written authorization from the patient first. [12]

Plaintiffs allege that when a person visits Jefferson Health's website, the Meta Collection Tools log which sites a person visits and uses that data to build its profile—for example, a person who visits a tab on Jefferson Health's website regarding chemotherapy, will have the characteristics and content of this information added to that person's Meta profile. [13] Jefferson Health can then use this data and analysis for its own purpose, including "understanding how people use its website and determining what ads people see on its website." [14] Plaintiffs specifically allege that after interactions with Jefferson Health's website they were served with advertisements for prescription drugs related to the specific conditions Plaintiffs were being treated for, as well as targeted advertisements related to their status as Jefferson Health patients. [15]

Plaintiffs allege Jefferson Health does not notify users of MyJeffersonHealth that IIHI is being contemporaneously sent to Meta, nor does Jefferson Health notify patients that Meta or Jefferson Health is using this information for commercial purposes. [16]

### B. Procedural Background

Plaintiffs initially named both Jefferson Health and Meta as Defendants. [17] The case was assigned to the docket of the Honorable Berle M. Schiller. [18] Judge Schiller severed the claims against Meta, which were transferred to the Northern District of California for consolidation with *In re Meta Pixel Healthcare Litigation.* [19] Jefferson Health filed a Motion to Dismiss the Amended Complaint under Rule 12(b)(6). [20] Judge Schiller granted Jefferson Health's Motion to Dismiss for failure to state a claim and dismissed Plaintiffs' Amended Complaint with leave to amend. [21]

***3** In his opinion, Judge Schiller held that: (1) Plaintiffs did not allege sufficient facts to state an Electronic Communications Privacy Act ("ECPA") claim; (2) Plaintiffs did not adequately plead causation and damages to support their negligence claim; and (3) Plaintiffs did not sufficiently plead a claim for intrusion upon seclusion. [22] Judge Schiller reviewed Plaintiffs' proposed Second Amended Complaint and determined that it would "not cure the Amended Complaint's deficiencies," but granted Plaintiffs further leave to amend their complaint "to the extent they can alleged sufficient facts to state their claims consistent with" the opinion. [23] Plaintiffs then filed a Second Amended Complaint, which Defendant has moved to dismiss. [24]

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [25] The Court must accept as true all factual allegations in the Second Amended Complaint and draw all reasonable inferences in favor of Plaintiffs. [26] However, Plaintiffs must plead "more than labels and conclusions," and "[f]actual allegations must be enough to raise the right to relief above the speculative level." [27]

## III. DISCUSSION

### A. Count One – Violation of the ECPA

Count One of the Second Amended Complaint asserts a violation of the ECPA. [28] The ECPA makes it illegal to intentionally intercept or attempt to intercept any wire, oral, or electronic communication; or to disclose or use the contents of an unlawfully intercepted communication. [29] An ECPA claim requires that plaintiff shows that the defendant: "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication, (5) using a device." [30] The ECPA contains a "party exception" under § 2511(2)(d) which provides that it is not unlawful to intercept

the communication when party to the communication.[31] A party may not, however, intercept communications "for the purpose of committing any criminal or tortious act."[32] This is referred to as the "crime-tort exception."[33]

Defendant argues that Plaintiffs fail to state a claim under the ECPA. First, Defendant argues that Plaintiffs fail to allege any unlawful interception. Second, Defendant argues that Plaintiffs fail to allege Jefferson Health's purpose was to commit a criminal or tortious act. Third, Defendant argues that Plaintiffs fail to allege any plausible interception of "contents."[34] Because Defendant is a party to the communications with Plaintiffs, Plaintiffs must sufficiently plead that Defendant not only intercepted Plaintiffs' communications, but that the interception was intentionally criminal or tortious.

An interception under the ECPA is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."[35] "Contents" is defined under the ECPA as including "any information concerning the substance, purport, or meaning of that communication."[36] "[S]ome queried URLs qualify as content" when the URL conveys "substantive information" regarding web browsing activity.[37] A claim that non-substantive contents or information was collected cannot give rise to a claim for interception under the ECPA.[38] The Court will therefore address Defendant's arguments concerning interception and contents together.

***4** Plaintiffs assert that the Meta Collection Tools deployed on Defendant's online portal and Mobile Application serve as the device to acquire Plaintiffs' "communications," namely, their alleged IIHI.[39] Defendant argues that where the health care provider was the intended recipient of the communication it could not have intercepted it.[40] However, the court in the case on which Defendant relies for this proposition later held that the plaintiffs had stated an ECPA claim when they alleged additional facts that the IIHI that was transmitted included content such as name and location of physician, physician's specialty, and the plaintiffs' particular health conditions.[41]

So too here. In addressing Plaintiffs' original complaint, Judge Schiller determined that Plaintiffs pleaded insufficient details to support an inference that specific communications were intercepted.[42] Plaintiffs now adduce additional facts to support their ECPA claim. Specifically, Plaintiffs allege that Defendant transmitted Plaintiffs' communications relating to appointments with medical providers, relating to specific healthcare providers, conditions, treatments, diagnoses, prognoses, prescription drugs, symptoms, insurance, and payment information, as well as messages exchanged in the patient portals.[43] Plaintiffs additionally allege that these communications and data were used by Meta to serve Plaintiffs advertisements for prescription drugs related to their health conditions in addition to advertisements focused on their status as patients of Jefferson Health.[44] By alleging that Defendant was able to collect and transmit this information using the Meta Collection Tools on Defendant's online portal and Mobile Application, Plaintiffs have sufficiently pleaded that Defendant intercepted contents of Plaintiffs' communications under the meaning of the ECPA.

Finally, Defendant argues that Plaintiffs fail to allege Jefferson Health's purpose was to commit a criminal or tortious act.[45] The Health Insurance Portability and Accountability Act ("HIPAA") makes it a federal crime to knowingly disclose IIHI to third parties.[46] IIHI is defined under HIPAA as:

> information that is a subset of health information, including demographic information collected from an individual, and:
>
> (1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and
>
> (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and
>
> > (i) That identifies the individual; or
> >
> > (ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual.[47]

Defendant argues that Plaintiffs have not sufficiently alleged that the intended use of the intercepted content was for a criminal or tortious purpose.[48] The Third Circuit has held that in order to invoke the crime-tort exception of the ECPA a plaintiff must plead an intended tortious or criminal use of the acquired information.[49] Plaintiffs allege that Defendant

intercepted Plaintiffs' IIHI for the intended use of disclosing the information to Meta, which is a HIPAA violation and therefore prohibited by federal law. [50] If Plaintiffs' allegations are to be taken as true, which the Court must do at the motion to dismiss stage, Defendant at minimum intended to violate HIPAA with the disclosure of Plaintiffs' IIHI to Meta. Courts have found the intention to violate HIPAA sufficient to invoke the crime-tort exception to the ECPA. [51]

***5** Defendant additionally argues that financial motives are not sufficient to prove an intent to tortiously injure Plaintiffs. [52] But Plaintiffs need not plead financial motive to invoke the crime-tort exception as they have already sufficiently pleaded Defendant's intention to violate HIPAA. Plaintiffs' ECPA claim will proceed.

### B. Count Two – Breach of Contract

Count Two of the Second Amended Complaint alleges a claim of breach of contract, which was not asserted in the First Amended Complaint.

Defendant first argues that no new claims were permitted under Judge Schiller's order, and that Plaintiffs' claim for breach of contract is "not authorized." [53] Defendant does not cite any case law to support this argument. Federal Rule of Civil Procedure 15(c)(1)(B) permits an amendment to a pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." [54] Relation back is proper when "there is a 'common core of operative facts in the two pleadings,' " [55] and there is a "clear preference" in Rule 15 for merits-based decision making. [56]

Plaintiffs' breach of contract claim is based on the assertion that Jefferson Health requires patients who use its website to agree to the "Terms and Conditions" to access the site, which incorporates Jefferson Health's privacy practices. [57] They allege that Jefferson Health's Terms and Conditions created an express contract, which Jefferson Health breached by disclosing the patient communications containing IIHI. [58]

Plaintiffs' claim is based entirely on the same core facts previously alleged in their complaints—namely, the alleged violation of Defendant's privacy policies and disclosure of Plaintiffs' communications with Defendant to Meta. Judge Schiller did not bar Plaintiffs from asserting additional bases for relief. The Court will consider this claim on the merits.

Under Pennsylvania law, to state a claim for breach of contract, plaintiff must plead: "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." [59] Defendant argues that Plaintiffs fail to allege a breach of contract because Plaintiffs do not allege mutual assent to the Terms and Conditions and Privacy Policy. [60] Plaintiffs have pleaded that agreement to the Terms and Conditions is a required condition to use MyJeffersonHealth. [61] Under these circumstances, Plaintiffs have plausibly pleaded mutual assent. [62]

Defendant further argues that Plaintiffs do not sufficiently allege recoverable damages. [63] Plaintiffs allege that they have suffered damages for several reasons, including in particular damages occurring from the loss of value of Plaintiffs' IIHI. [64] "[S]everal courts have recognized the property value of personal information." [65] The actual value of the damages is not for the Court to determine at a motion to dismiss stage. The Court will deny Defendant's motion to dismiss Count Two of the Second Amended Complaint.

### C. Count Three – Negligence

***6** Count Three of the Second Amended Complaint alleges a claim for negligence, which requires Plaintiffs to plead: "(1) the existence of a duty or obligation recognized by law; (2) a failure on the part of the defendant to conform to that duty, or a breach thereof; (3) a causal connection between the defendant's breach and the resulting injury; and (4) an actual loss or damage suffered by the [plaintiff]." [66]

Defendant's first argument, relegated to a footnote, is that Plaintiffs have "failed to sufficiently allege that publication of its privacy policy established a duty of care." [67] Judge Schiller previously held that Plaintiffs had plausibly alleged the existence of a duty of care. [68] Defendant provides no new argument or support to justify relitigating this claim, and so the Court sees no reason to revisit it as the allegations of the Second Amended Complaint are as strong, if not stronger on this point. Further, an argument made in a footnote will not be entertained. Plaintiffs have established a duty of care at the motion to dismiss stage.

Defendant next argues that Plaintiffs have failed to allege that Defendant's alleged disclosures caused them damage or that they incurred any actual loss or injury. [69] Plaintiffs have sufficiently pleaded that the disclosure of Plaintiffs' IIHI to Meta to allow Defendant and Meta to tailor advertisements on their respective web properties impaired Plaintiffs' control over their IIHI, and would not have occurred without Defendant's installation of Meta's Collection Tools MyJeffersonHealth. [70] As discussed above, Plaintiffs have sufficiently alleged damages. [71] The Court will deny Defendant's motion to dismiss Count Three of the Second Amended Complaint.

**D. Count Four – Invasion of Privacy, Intrusion Upon Seclusion**

Count Four of the Second Amended Complaint alleges intrusion upon seclusion. This is a state law privacy tort that requires plaintiff to show: (1) an intentional intrusion; (2) upon the seclusion of another that is (3) highly offensive to a reasonable person. [72]

First, Defendant argues that Plaintiffs have not properly pleaded an intrusion upon seclusion claim "because the alleged intrusion, if any, is carried out by a third party, Meta —not by Jefferson Health." [73] Second, Defendant argues that Plaintiffs "fail to plead facts showing that Jefferson Health engaged in 'highly offensive' conduct." [74]

The Third Circuit has held a website operator commits an intentional intrusion where the website operator tracks plaintiffs' online behavior "without their permission to do so." [75] The allegations concerning Defendant's deployment of the Meta Collection Tools meet this standard. [76]

***7** Plaintiffs also have alleged that Defendant's status as their healthcare provider created a reasonable expectation of privacy. [77] Defendant argues that courts have held data collection and disclosure to third parties is "routine commercial behavior" that does not constitute highly offensive conduct. [78] But the cases Defendant cite to support this proposition appear to be related to collection by LinkedIn and Google, not healthcare providers, and the information alleged to be disclosed was browsing history, not IIHI. Conduct can be considered "highly offensive" when the website stated that it would not collect personal information, therefore creating an expectation of privacy. Plaintiffs have plausibly alleged that Defendant's status as a healthcare provider, coupled with the Privacy Policies, created an expectation of privacy that would be "highly offensive" to breach. [79] Defendant acknowledges that "the unauthorized disclosure of actual private medical information ... may certainly constitute 'highly offensive' conduct," [80] and that is what Plaintiffs allege here. The Court will deny the motion to dismiss Count Four of the Second Amended Complaint.

**E. Count Five – Unjust Enrichment**

Count Five of the Second Amended Complaint alleges unjust enrichment, which was not asserted in the First Amended Complaint.

Defendant again argues that no new claims were permitted under Judge Schiller's order, and that Plaintiffs' claim for unjust enrichment is "not authorized." [81] Like their claim for breach of contract, Plaintiffs' argument for unjust enrichment centers around the allegation that Plaintiffs' IIHI conferred an economic benefit on Defendant, and the transmission of Plaintiffs' IIHI was wrongfully and unlawfully transmitted. [82] These facts have been central to Plaintiffs' claims since the original complaint, and therefore relation back is appropriate and Judge Schiller did not foreclose Plaintiffs from asserting the claim. [83]

To plead unjust enrichment, a plaintiff must show that: "(1) the plaintiff conferred benefits on the defendant, (2) the defendant appreciated such benefits, and (3) the benefits were accepted and retained under such circumstances that it would be inequitable for the defendant to retain the benefit without the payment of value." [84] Defendant argues that, because Plaintiffs plead the unjust enrichment claim by realleging and incorporating allegations, instead of pleading the unjust enrichment claim in the alternative, "Plaintiffs' unjust enrichment claim is therefore predicated on the previous allegations of a binding contract and must be dismissed." [85] "It is well-settled in Pennsylvania that the existence of a contract prevents a party from bringing a claim for unjust enrichment." [86] Nevertheless, Rule 8(d)(2) "permits a plaintiff to plead unjust enrichment in the alternative in certain circumstances," including where "the existence of a contract is uncertain or its validity is disputed by the parties." [87] Because Defendant disputes the validity of the contract, the alternative claim for unjust enrichment is not barred.

Defendant further argues that there was no benefit conferred on it to retain. [88] This argument is similarly unpersuasive. Plaintiffs have plausibly pleaded that Defendant was enriched through the collection of Plaintiffs' IIHI. At minimum, Plaintiffs have plausibly alleged that by receiving Plaintiffs' data and disclosing it to Meta to tailor advertisements related to Plaintiffs' medical needs or status as a patient of Defendant, Defendant may have received the benefit of this targeted advertisement.

***8** Defendant further argues that Plaintiffs do not plead that they had any reasonable expectations of compensation for their IIHI. But the cases Defendant cites to support this specific claim are inapplicable here. The only case addressing the sale of personally identifiable medical information under a Pennsylvania state law unjust enrichment claim dealt with information that was de-identified under HIPAA prior to transmission to a third party and was therefore no longer IIHI. [89] The Court will deny the motion to dismiss Count Five.

**IV. CONCLUSION**

For the foregoing reasons, Jefferson Health's Motion to Dismiss the Second Amended Complaint will be dismissed, and Plaintiffs' claims will proceed to discovery. An order will be entered.

**All Citations**

Slip Copy, 2024 WL 4350328

## Footnotes

1 The facts alleged in the Second Amended Complaint are assumed true for purposes of ruling on the motion to dismiss.

2 Second Am. Compl. [Doc. No. 36] at ¶ 154.

3 Second Am. Compl. [Doc. No. 36] at ¶¶ 155, 163.

4 Second Am. Compl. [Doc. No. 36] at ¶¶ 156, 164.

5 Second Am. Compl. [Doc. No. 36] at ¶ 1.

6 Second Am. Compl. [Doc. No. 36] at ¶ 3.

7 Second Am. Compl. [Doc. No. 36] at ¶ 5.

8 Second Am. Compl. [Doc. No. 36] at ¶ 1.

9 Second Am. Compl. [Doc. No. 36] at ¶ 7.

10 Second Am. Compl. [Doc. No. 36] at ¶ 9.

11 Second Am. Compl. [Doc. No. 36] at ¶ 67.

12 Second Am. Compl. [Doc. No. 36] at ¶¶ 68–69.

13 Second Am. Compl. [Doc. No. 36] at ¶¶ 73–75.

14 Second Am. Compl. [Doc. No. 36] at ¶ 76.

15 *See* Second Am. Compl. [Doc. No. 36] at ¶¶ 158–161; 165–168.

16 Second Am. Compl. [Doc. No. 36] at ¶¶ 78–80.

17 Compl. [Doc. No. 1].

18 The case was reassigned to the docket of this Court on December 7, 2023. *See* Order [Doc. No. 42].

19 Civil Action No. 22-3580 (N.D. Cal. filed June 17, 2022). *See* Order of Feb. 27, 2023 [Doc. No. 26].

20 Mot. Dismiss Am. Compl. [Doc. No. 23].

21 Mem. Op. and Order Oct. 10, 2023 [Doc. Nos. 34 & 35].

22 Mem. Op. and Order Oct. 10, 2023 [Doc. Nos. 34 & 35].

23 Mem. Op. Oct. 10, 2023 [Doc. No. 34] at 14.

24 Mot. Dismiss. Second Am. Compl [Doc. No. 39].

25 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

26 Fed. R. Civ. P. 12(b)(6); *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023).

27 *Twombly*, 550 U.S. at 555 (citation omitted).

28 18 U.S.C. § 2510, *et seq.*

29 18 U.S.C. § 2511(1)(a)-(d).

30 *Smart v. Main Line Health*, No. 22-5239, 2024 WL 2943760, at *3 (E.D. Pa. June 10, 2024) (quoting *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 135 (3d Cir. 2015)).

31 18 U.S.C. § 2511(2)(d).

32 *Id.*

33 *Smart*, 2024 WL 2943760, at *3.

34 *See* Mem. Supp. Mot. Dismiss Second Am. Compl. [Doc. No. 39-1] at 10.

35 *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 274–75 (3d Cir. 2016) (citation omitted).

36 18 U.S.C. § 2510(8).

37 *Nickelodeon*, 927 F.3d at 275 (citation omitted).

38 *See id.*

39 Second Am. Compl. [Doc. No. 36] at ¶ 192.

40 Mem. Supp. Mot. Dismiss Second Am. Compl. [Doc. No. 39-1] at 6 (citing *Kurowski v. Rush Sys. for Health*, No. 22-5380, 2023 WL 2349606, at *4 (N.D. Ill. Mar. 3, 2023)).

41 *Kurowski v. Rush Sys. for Health*, No. 22-5380, 2023 WL 8544084, at *3 (N.D. Ill. Dec. 11, 2023).

42 Mem. Op. Mem. Op. Oct. 10, 2023 [Doc. No. 34] at 6.

43 Second Am. Compl. [Doc. No. 36] at ¶ 190.

44 Second Am. Compl. [Doc. No. 36] at ¶ 161, 168.

45 *See* Mem. Supp. Mot. Dismiss. Second Am. Compl [Doc. No. 39-1] at 7–10.

46 *See* 42 U.S.C. § 1320d-6.

47 45 CFR § 160.103.

52 Mem. Supp. Mot. Dismiss. Second Am. Compl [Doc. No. 39-1] at 10.

48 Mem. Supp. Mot. Dismiss. Second Am. Compl [Doc. No. 39-1] at 8.

49 *In re Google*, 806 F.3d at 145.

50 *See* Second Am. Compl. [Doc. No. 36] at ¶ 199; 42 U.S.C. § 1320d-6.

51 *See A.D. v. Aspen Dental Management, Inc.*, No. 24-1404, 2024 WL 4119153, at *3 (N.D. Ill. Sept. 9, 2024); *see also Kurowski*, 2023 WL 8544084 at *2.

53 Mem. Supp. Mot. Dismiss. Second Am. Compl [Doc. No. 39-1] at 2.

54 Fed. R. Civ. Pro. 15(c)(1)(B).

55 *T Mobile Ne. LLC v. City of Wilmington*, 913 F.3d 311, 328 (3d Cir. 2019).

56 *Id.*

57 Second Am. Compl. [Doc. No. 36] at ¶ 211.

58 Second Am. Compl. [Doc. No. 36] at ¶¶ 212–16.

59 *DelphX Corp. v. Fondren*, 600 F. Supp. 3d 540, 547–48 (E.D. Pa. 2022) (quoting *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016)).

60 Memo. Supp. Mot. Dismiss. Second Am. Compl [Doc. No. 39-1] at 13.

61 Second Am. Compl. [Doc. No. 36] at ¶ 211.

62 *Hutt v. Xpressbet, LLC*, No. 20-494, 2020 WL 2793920, at *5 (E.D. Pa. May 29, 2020).

63 Memo. Supp. Mot. Dismiss. Second Am. Compl [Doc. No. 39-1] at 13.

64 Second Am. Compl. [Doc. No. 36] at ¶ 218.

65 *Opris v. Sincera Reprod. Med.*, No. 21-3072, 2022 WL 1639417, at *8 (E.D. Pa. May 24, 2022) (collecting cases).

66 *Sullivan v. Truist Bank*, No. 23-3363, 2024 WL 422667, at *2 (E.D. Pa. Feb. 5, 2024) (citing *Orner v. Mallick*, 527 A.2d 521, 523 (Pa. 1987)).

67 Memo. Supp. Mot. Dismiss. Second Am. Compl. [Doc. No. 39-1] at 14 n.3.

68 Mem. Op. Oct. 10, 2023 [Doc. No. 34] at 8. ("[T]he Amended Complaint does plausibly allege Jefferson Health owed Plaintiffs a duty of care via the publication of its privacy policies.").

69 Memo. Supp. Mot. Dismiss. Second Am. Compl. [Doc. No. 39-1] at 15.

70 Pls.' Mem. Opp'n Mot. Dismiss [Doc. No. 43] at 21–22.

71 *Supra* Section III.B.2.

72 *Doe v. Hosp. of Univ. of Pa.*, 546 F. Supp. 3d 336, 351 (E.D. Pa. 2021); *see also* *Harris by Harris v. Easton Pub. Co.*, 483 A.2d 1377, 1383 (Pa. 1984) (citing Restatement (Second) of Torts § 652B).

73 Memo. Supp. Mot. Dismiss. Second Am. Compl. [Doc. No. 39-1] at 16.

74 Memo. Supp. Mot. Dismiss. Second Am. Compl. [Doc. No. 39-1] at 16.

75 *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 293–94 (3d Cir. 2016).

76 Second Am. Compl. [Doc. No. 36] at ¶ 233.

77 Second Am. Compl. [Doc. No. 36] at ¶ 235.

78 Memo. Supp. Mot. Dismiss. Second Am. Compl. [Doc. No. 39-1] at 19–20 (quoting *Hammerling v. Google, LLC*, 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022)).

79 Second Am. Compl. [Doc. No. 36] at ¶ 235. *See Nickelodeon* at 295.

80 Memo. Supp. Mot. Dismiss. Second Am. Compl [Doc. No. 39-1] at 20 n.5.

81 Memo. Supp. Mot. Dismiss. Second Am. Compl. [Doc. No. 39-1] at 2.

82 Second Am. Compl. [Doc. No. 36] at ¶¶ 250–54.

83 *See supra* Section III.B.1.

84 *Berardi v. USAA Gen. Indem. Co.*, 606 F. Supp. 3d 158, 163 (E.D. Pa. 2022).

85 Memo. Supp. Mot. Dismiss. Second Am. Compl. [Doc. No. 39-1] at 20–21.

86 *Vantage Learning (USA), LLC v. Edgenuity, Inc.*, 246 F. Supp. 3d 1097, 1100 (E.D. Pa. 2017).

87 *Id.*

88 Memo. Supp. Mot. Dismiss. Second Am. Compl [Doc. No. 39-1] at 21–22.

89 *Steinberg v. CVS Caremark Corp.*, 899 F. Supp. 2d 331, 336 (E.D. Pa. 2012).

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

2024 WL 4119153
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

A.D., R.G., T.B., E.W., M.H., S.B., C.C., K.F., C.M., A.O., A.H., and C.A., individually and on behalf of all others similarly situated, Plaintiffs,
v.
ASPEN DENTAL MANAGEMENT, INC., Defendant.

No. 24 C 1404
|
Signed September 9, 2024

**Attorneys and Law Firms**

Andrew Ready Tate, Pro Hac Vice, Peiffer Wolf Carr Kane Conway & Wise LLP, Atlanta, GA, Britany Kabakov, David S. Almeida, Almeida Law Group LLC, Chicago, IL, Brandon Michael Wise, Peiffer Wolf Carr Kane Conway & Wise LLP, St. Louis, MO, for Plaintiffs.

C.M., Pro Se.

Bonnie Keane DelGobbo, Baker & Hostetler LLP, Chicago, IL, Joel C. Griswold, Baker & Hostetler, LLP, Orlando, FL, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Virginia M. Kendall, United States District Judge

***1** Plaintiffs A.D., R.G., T.B., E.W., M.H., S.B., C.C., K.F., C.M., A.O., A.H., and C.A., filed suit on behalf of themselves and a putative class of similarly situated persons against Aspen Dental Management ("Aspen"). Plaintiffs allege that Aspen embedded tracking pixels and other technology on its website to collect and transmit personally identifiable and protected health information to third parties like Facebook, Google, and Bing. (*See generally*, Dkt. 7 "FAC"). Aspen moves to dismiss Plaintiffs' Complaint under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 20). For the reasons below, Aspen's motion [20] is granted in part and denied in part.

**BACKGROUND**

Defendant Aspen is a dental service organization that provides business support services to dentists, ranging from practice consulting to total practice management. (FAC ¶¶ 4, 68). One of the services Aspen provides is maintenance of the website located at https://www.aspendental.com/ (the "Website"). (*Id.* ¶ 6). Individuals visiting the Website ("Users"), can search for information about a specific dental condition, locate providers, and schedule appointments and procedures. (*Id.* ¶¶ 6–7).

Plaintiffs and putative class members are individuals who use Aspen's online platform. (*Id.* ¶¶ 53–67). They allege that Aspen disclosed their personally identifiable information ("PII") and protected health information ("PHI") to third parties, like Meta Platforms, Inc. d/b/a Meta ("Facebook") and Google LLC d/b/a Google ("Google"), via tracking pixels, first-party cookies, and conversion application programming interface ("CAPI") tools. (*Id.* ¶¶ 7–8, 10–20). Aspen configured and installed these tracking tools to bolster its profits by way of targeted advertisements that are created based on the private health information that the plaintiffs inputted on its website. (*Id.* ¶ 24).

Aspen's tracking devices operate as follows: when an individual accesses a certain page or submits a search query on Aspen's website, the individual's browser sends a request to Aspen's server to load the particular webpage. (*Id.* ¶¶ 23 n. 15, 203). At the same time, the tracking pixels embedded on Aspen's website duplicate the communication and send it to third-party servers, like Facebook, alongside a transcription of the communication's content and the individual's identity. (*Id.* ¶¶ 106–11, 199–200, 203–07). Aspen's tracking pixels are configured to collect Users' sensitive health information, such as their status as patients, medical appointments, healthcare providers, medical conditions, and treatments. (*Id.*). This sensitive health information is then disclosed to companies, like Facebook and Google, alongside Users' IP addresses and "unique Facebook IDs" which, in turn, is used to build marketing and other data profiles to identify, target, and market specific products and services to these individuals. (*Id.* ¶¶ 14, 29–30).

Plaintiffs filed suit on behalf of themselves and seven putative classes—a nationwide class and statewide classes in Illinois, Florida, Massachusetts, Washington, California, and Pennsylvania—whose private information was disclosed to third parties through the tracking pixels and related tracking technologies employed on Aspen's online platform. (*Id.* ¶¶ 384–91). The Complaint raises a federal claim under

the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), et seq. (Count I), as well as state law claims for negligence (Count II), invasion of privacy (Count III), unjust enrichment (Count IV), breach of implied contract (Count V), violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, et seq. (Count VI), violation of the Illinois Eavesdropping Statute, 720 ILCS 5/14, et seq. (Count VII), violation of the Florida Security Communications Act ("FSCA"), Fla. Stat. § 934.01, et seq. (Count VIII), violation of the Massachusetts Consumer Protection Act ("MCPA"), M.G.L. § 93A, et seq. (Count IX), violation of the Massachusetts Wiretap Act ("MWA"), M.G.L. C. 272 § 99 (Count X), violation of the Washington Consumer Protection Act ("WCPA"), Wash. Rev. Code Ann. § 19.86.020, et seq. (Count XI), violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, et seq. (Count XII), violation of the California Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code § 56, et seq. (Count XIII), violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq. (Count XIV), and violation of the Pennsylvania Wiretap Act ("WESCA"), 18 Pa. Cons. Stat. § 5701, et seq. (Count XV). (FAC). Aspen moves to dismiss Plaintiffs' class action complaint for failure to state a claim under Rule 12(b)(6). (Dkt. 20).

## LEGAL STANDARD

***2** A Rule 12(b)(6) motion tests whether the plaintiff has provided "enough factual information to state a claim to relief that is plausible on its face" and has raised "a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (*citing Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)). In deciding a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party. *Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021). Dismissal is proper where "the allegations ..., however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

## DISCUSSION

Before addressing Aspen's arguments in support of dismissal, the Court notes that Plaintiffs withdrew several of their claims in their response brief, including their claims for invasion of privacy (Count III), breach of implied contract (Count V), and violation of the Massachusetts Consumer Protection Act (Count IX). These claims are therefore withdrawn, and the Court will not address them further.

Aspen challenges Plaintiffs' Complaint on the grounds that the allegations are insufficient to state claims upon which relief may be granted. The Court addresses each argument in turn.

### I. Electronic Communications Privacy Act

In Count I, Plaintiffs allege violations of the ECPA. The ECPA provides a private right of action against any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any ... electronic communication." 18 U.S.C. § 2511(1)(a). The same is true for anyone who intentionally discloses or uses the contents of an intercepted communication. 18 U.S.C. §§ 2511(1)(c) & (d). Under the so-called "one-party exception," the ECPA is not violated if the person intercepting the communication "is a party to the communication or where one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(d). The one-party exception does not apply, however, if the "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." *Id.*

First, Aspen argues that Plaintiffs' ECPA claim fails under the statute's one-party exception because Aspen was a party to the communications and the crime-tort exception does not apply. Aspen relies on *Desnick*, the leading Seventh Circuit opinion on this issue, which stands for the proposition that the crime-tort exception applies when the defendant had criminal or tortious intent at the time it committed the alleged violation, but not when the defendant later misused the intercepted communication in furtherance of a separate crime. *Desnick v. Am. Broad. Companies, Inc.*, 44 F.3d 1345 (7th Cir. 1995). In *Desnick*, the defendant sent testers armed with undercover surveillance devices into a doctor's office to see whether the doctor would recommend unnecessary cataract surgery on the testers, which the doctor did. *Id.* at 1353. Later, the defendant aired a broadcast featuring footage from the testers' office visits and describing the doctor's unscrupulous conduct. The doctor sued, bringing claims of defamation and violation of the ECPA. In reaching its conclusion that the crime-tort exception did not apply, the court focused on fact that defendant did not send testers to the doctor's office with

recording equipment for the purpose of defaming the doctor by charging tampering with medical equipment.

***3** The case at bar is distinguishable. Accepting Plaintiffs' allegations as true, as the Court must at this stage, Aspen placed tracking technology on its website with the intent to collect and disclose users' personal health information for purposes of financial gain, in violation of 42 U.S.C. § 1320d-6 of the Health Insurance Portability and Accountability Act ("HIPAA")

Section 1320d-6 of HIPAA imposes federal criminal liability for one who knowingly discloses "individually identifiable health information" ("IIHI") to third parties. IIHI is any information that:

> (A) is created or received by a health care provider ... and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and – (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individuals. 42 U.S.C. § 1320(d)(6).

Here, Plaintiffs allege that Aspen, via the tracking devices employed on its webpages, transmitted Plaintiffs' patient status, medical conditions, information about their medical appointments and treatments, specific medical providers, and other sensitive health information to third parties. (FAC ¶ 173). Plaintiffs' allegations regarding their individual experiences using Aspen's online platform—and the inferences drawn from those experiences—are sufficient to plausibly allege that Aspen disclosed information regarding their personal health conditions and treatments to third parties. Such information qualifies as IIHI for purposes of HIPAA. Further, Plaintiffs allege that Aspen's collection and disclosure of their personal health information was done knowingly and for purposes of financial gain—namely, to bolster profits via targeted marketing campaigns. (*Id.* ¶¶ 264, 271, 456). Aspen claims that its only purpose was to improve its marketing and boost its revenues, but this purpose cannot be detached from the reality that Aspen achieved this improved marketing and revenue boost by disclosing Plaintiffs IIHI. Taken as a whole, Plaintiffs allegations are sufficient to invoke HIPAA for purposes of the ECPA's crime-tort exception.

Aspen secondarily argues that the crime-tort exception does not apply because the underlying criminal or tortious acts must be distinct from the alleged wiretapping. But Aspen does not cite to any precedential authority supporting this position and the Court is not aware of any. Even if the crime-tort exception did require an act distinct from the alleged wiretapping, Plaintiffs plausibly allege that Aspen intended to violate the HIPAA when it transmitted Plaintiffs' information to third parties, which is distinct from the improper interception at issue in the ECPA claim. Accordingly, Aspen's motion to dismiss Count I is denied.

## II. State Wiretap Act Violations

### A. Illinois Eavesdropping Statute

In Count VII, Plaintiffs allege violations of the Illinois Eavesdropping Statute. This statute creates a civil cause of action against an eavesdropper who knowingly, intentionally, and surreptitiously "[u]ses an eavesdropping device" to transmit or record "all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation." 720 ILCS 5/14-2(a)(2); *see also* 720 ILCS 5/14-6 (civil remedies). The definition of "eavesdropping device" includes any device capable of being used to intercept or transcribe electronic communications. 720 ILCS 5/14-1(a). The statute also prohibits the use or disclosure of any information which the eavesdropper "knows or reasonably should know was obtained from a private conversation or private electronic communication ... unless he or she does so with the consent of all of the parties." 720 ILCS 5/14-2(a)(5).

***4** Aspen contends that Plaintiffs cannot state a claim under the Illinois Eavesdropping Statute because the statute only applies to a person who is not a party to the communication. (Dkt. 21 at 9). Aspen is correct that the statute proscribes use of an eavesdropping device by a non-party for the purpose of "overhearing, transmitting, or recording all or any part of any private conversation," 720 ILCS 5/14-2(a), but that is only one way in which the statute may be violated. Here, Plaintiffs allege violations based on use of an eavesdropping device "for

the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party." (FAC ¶ 520) (citing 720 ILCS 5/14-2(a)(2)). That Aspen is alleged to have been a party to the intercepted communications is, thus, not fatal to Plaintiffs' claim.

Aspen also argues that Plaintiffs cannot state a claim because the statute only applies to oral communications. The statute clarifies that "private conversation" means "any oral communication between 2 or more persons, whether in person or transmitted between the parties by wire or other means." 720 ILCS 5/14-1(d). Plaintiffs insist that communications over the internet are within the scope of this definition. In the briefing on this issue, neither party points to a relevant construction of the Illinois Eavesdropping Statute by the Illinois Supreme Court or any Illinois Court of Appeals. The text of the statute, however, appears to support Aspen's construction.

After defining "private conversation," the statute separately defines "private electronic communication" to mean "any transfer of ... writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system." 720 ILCS 5/14-1(e). The difference in these definitions suggests legislative intent to distinguish between the disclosure of conversations, like those occurring in-person or over the phone, and electronic communications, like the private user data and appointment scheduling information at issue here. (*See generally* FAC ¶¶ 113, 527–29).

For the purposes of this motion and based on the briefing before the Court, the Court concludes that 720 ILCS 5/14-1(d) does not apply to the electronic communications about which Plaintiffs complain. Accordingly, Count VII is dismissed.

### B. Massachusetts Wiretap Act

In Count X, Plaintiffs allege that Aspen violated the MWA. Aspen asserts that Plaintiffs' MWA claim fails because the MWA excludes activities undertaken in the ordinary course of business from the statutory definition of an unlawful "interception." Mass. Gen. Laws Ann. ch. 272, § 99(B)(3). Plaintiffs argue that the exception does not apply here because, they claim, using tracking technology to send user information to third parties is not part of Aspen's ordinary course of business. While Aspen is in the business of providing support to dental practices, even the Complaint alleges that the Website routinely collected and transmitted Users' PHI to third parties for the purpose of generating revenue. (FAC ¶¶ 87, 107, 113). The most reasonable inference, then, is that the actions underlying Plaintiffs MWA claim were a part of Aspen's ordinary course of business. Indeed, the ability to target marketing towards viable consumers is an "unavoidable byproduct or consequence" of doing business in the modern age. *Dillon v. Massachusetts Bay Transp. Auth.*, 49 Mass. App. Ct. 309, 319 (2000) (citing *Amati v. Woodstock*, 176 F.3d 952, 956 (7th Cir.), *cert. denied*, 528 U.S. 985 (1999)). Targeted marketing, facilitated by tracking one's online activity, is so pervasive that it is "apt to be known" and is properly considered within the bounds of Aspen's ordinary course of business. *Amati*, 176 F.3d at 955. Thus, Aspen's motion to dismiss Count X is granted.

### C. Florida Security of Communications Act, California Information Privacy Act, and Pennsylvania Wiretap Act

***5** In Counts VIII, XII, and XV, Plaintiffs claim that Aspen violated various state consumer protection acts, including the FSCA, WESCA and CIPA, when it used the Pixel and other tracking technology to intercept their communications with Aspen's website and transmit that information to third parties. Aspen argues Plaintiffs cannot state a claim under any of these statutes. The Court considers each argument in turn.

#### 1. Contents of Communication

According to Aspen, Plaintiffs have not sufficiently alleged that any "contents" of a communication were intercepted. This argument applies to the FSCA, WESCA, and CIPA claim. The FSCA, WESCA, and CIPA, like many states' wiretapping laws, were modeled after the ECPA. As a result, Florida, Pennsylvania, and California courts look to federal courts as to the meaning of analogous provisions, including what constitutes "contents" of a communication. *See, e.g.*, *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 125–126 (3d Cir. 2022) (WESCA "operates in conjunction with and as a supplement to the Federal Wiretap Act, 18 U.S.C. § 2150 et seq."); *Minotty v. Baudo*, 42 So.3d 824, 831 (Fla. 4th Dist. Ct. App. 2010) (noting that "Florida follows federal courts as to the meaning of provisions after which Chapter 934 was modeled"); *Gutierrez v. Converse Inc.*, 2023 WL 8939221, at *3 (C.D. Cal. Oct. 27, 2023) (the "CIPA fails to define 'contents,' [so] federal courts look to the analogous Federal

Wiretap Act for guidance"). "Contents" of a communication include "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (defining "contents"); Fla. Stat. Ann. § 934.02 (same); 18 Pa. Cons. Stat. Ann. § 5702 (same).

Aspen argues that Plaintiffs' allegations are insufficient to show that the "contents" of their communications were disclosed because data like URLs from Plaintiffs' browsing history—which included Plaintiffs' search terms about medical conditions and types of treatments—are not properly considered the type of content covered under the state wiretapping statutes at hand. Courts interpreting contents under the ECPA distinguish between "a record or other information pertaining to a ... customer" (known as "record information") and the contents—i.e., "substance, purport, or meaning"—of the communication itself. *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014) (quotations omitted) ("[T]he term 'contents' refers to the intended message conveyed by the communication, and does not include record information.").

With respect to metadata like URLs, courts have differentiated between those that provide "basic identification and address information," and those that disclose a "search term or similar communication made by the user." *See Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076 (N.D. Cal. 2023) (citing *In re Zynga Priv. Litig.*, 750 F.3d at 1108–09). Such courts have reasoned that while the former constitutes record information, the latter qualifies as "content" for purposes of the ECPA. *See id.*; *see also In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 137 (3d Cir. 2015) ("URLs may be dialing, routing, addressing, or signaling information, but only when they are performing such a function." If instead a URL is "part of the substantive information conveyed to the recipient, then by definition it is 'content.' "). In this case, the URLs at issue include terms entered into search fields and fillable forms. (FAC ¶ 140). This is sufficient to plausibly allege that covered "content" was intercepted. *See, e.g., In re Grp. Health Plan Litig.*, 2023 WL 8850243, at *7; *Meta Platforms, Inc.*, 690 F. Supp. 3d at 1076–77.

2. <u>Device</u>

***6** Next, Aspen argues that Plaintiffs fail to plausibly allege that a "device" was used to intercept the communications. This argument applies to the FSCA and WESCA claims. The FSCA and WESCA, like the ECPA, defines "electronic, mechanical, or other device" as "any device or apparatus which can be used to intercept a wire, oral, or electronic communication" with a few exceptions for tangible items such as telephones, hearing aids. *See* 18 U.S.C.A. § 2510(5); Fla. Stat. Ann. § 934.02(4); 18 Pa. Cons. Stat. Ann. § 5702. The MWA defines "intercepting device" as "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication." Mass. Gen. Laws Ann. ch. 272, § 99(B)(3).

Whether software is properly considered a "device" within the meaning of these statutes is unsettled. *See e.g., Jacome v. Spirit Airlines, Inc.*, No. 2021 WL 3087860, at *4 (Fla. Cir. Ct. June 17, 2021) (finding it persuasive that other courts have held that "software" does not constitute a "device") (first citing *Potter v. Havlicek*, 2008 WL 2556723, at *8 (S.D. Ohio June 23, 2008); then citing *Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*, 2007 WL 4394447, at *4 (E.D. Pa. Dec. 13, 2007)). *But see Makkinje v. Extra Space Storage, Inc.*, 2022 WL 80437, at *2 (M.D. Fla. Jan. 7, 2022) (finding persuasive that the "Eleventh Circuit has determined that software can constitute a 'device' in the wiretapping context") (citing *United States v. Barrington*, 648 F.3d 1178, 1203 (11th Cir. 2011)).

Here, Plaintiffs allegations include a plausible explanation of how the tracking technology employed by Aspen captured information communicated by website users and transmitted that information to third parties. (FAC ¶¶ 11, 17, 92-94, 116, 132). Absent contrary authority, Plaintiffs allegations are sufficient to support their assertion the tracking technology Aspen employed is properly considered a "device."

3. <u>Electronic Communications</u>

Aspen also argues that Plaintiffs fail to allege that any "electronic communications" were intercepted. This argument applies to the FSCA and WESCA claims. Like the ECPA, the FSCA and WESCA define "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12) (defining "electronic communication"); Fla. Stat. Ann. § 934.02(12) (same); 18 Pa. Cons. Stat. Ann. § 5702 (same). As with the term "device," it is unsettled whether information

entered into a search field or online form constitutes an "electronic communication." *See* Jacome, 2021 WL 3087860, at *3–5 (session replay software did not capture "electronic communications"); *Goldstein v. Costco Wholesale Corp. ("Costco")*, 559 F. Supp. 3d 1318, 1322 (S.D. Fla. 2021) (ruling that the FSCA does not apply to claims regarding session replay software). *But see* Katz-Lacabe v. Oracle Am., Inc., 2023 WL 6466195, at *5 (N.D. Cal. Oct. 3, 2023), *aff'd*, 2023 WL 7166815 (N.D. Cal. Oct. 30, 2023) (transmissions containing "data entered by the user into forms" and certain URLs "constitute electronic communications under the FSCA"). Once again, neither side cites to binding precedent on this issue and, in the absence of contrary authority, Plaintiffs' allegations plausibly state that the tracking technology transmitted their data, writing, and signals through a covered system that affects interstate commerce.

4. Location of Interception

According to Aspen, Plaintiffs do not sufficiently allege that the interception occurred within Pennsylvania as required to state a claim under the WESCA. Here, Plaintiffs allege that they used Aspen's website in Pennsylvania and that the tracking technology at issue works by planting a bug on users' browsers. The only reasonable inference to draw from these facts is that the tracking technology picked up Plaintiffs' communications from their web browsers, located in Pennsylvania. Based on these allegations, Plaintiffs plausibly allege that Aspen's interception occurred on Plaintiffs' browser, located in Pennsylvania. Ultimately, Plaintiffs bear the burden of proving that the interception actually occurred in Pennsylvania but, at this point, the "factual content" of the pleadings are sufficient to allow the Court to "draw the reasonable inference that [Aspen] is liable for the alleged misconduct." *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

5. In Transit

***7** Finally, Aspen argues that Plaintiff C.M. fail to state a claim under the CIPA because they do not allege that C.M.'s communications were intercepted while "in transit," as required by the CIPA. Aspen argues that no communication could be intercepted "in transit" because two separate communications occur: one between Aspen's website and Users' browser, and one between the User's browser and a third party, like Facebook. That Aspen disagrees with Plaintiff's factual allegation is insufficient to justify dismissing Plaintiff's CIPA claim. C.M. contends that Aspen both "use[d] source code to commandeer the User's computing device, causing the device to contemporaneously and invisibly re-direct the Users' communications to third parties" and "employed ... tracking technologies, to intercept, duplicate, and re-direct Plaintiffs' ... Private Information" to third parties. (FAC ¶¶ 105–07, 114–15). Though Plaintiff will bear the burden of proving each element of their claim, the allegations in the Complaint are sufficient to plausibly allege that Plaintiff's communications were intercepted in transit.

Accordingly, Aspen's motion to dismiss is denied with respect to Counts VIII, XII, and XV.

## III. State Consumer Protection Claims

### A. ICFA

In Count VI, Plaintiffs A.D, R.G., C.C. and K.F. allege that Aspen engaged in deceptive acts and practices in violation of the ICFA. "In order to state a claim under the ICFA, a plaintiff must show: '(1) a deceptive or unfair act or promise by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) that the unfair or deceptive practice occurred during a course of conduct involving trade or commerce.' " *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2014) (quoting *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012)). The plaintiff must also "plausibly plead that the deceptive or unfair act caused her to suffer actual damages, meaning pecuniary loss." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 647 (7th Cir. 2019) (citing *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010)).

Aspen argues that Plaintiffs' ICFA claim cannot proceed because Plaintiffs (1) fail to allege deception; (2) they have not pleaded actual, pecuniary loss; (3) and they cannot establish an ICFA claim based on the Illinois Personal Information Protection Act ("PIPA"). Because Plaintiffs failed to allege the specific economic damages necessary to bring their claim under the ICFA, the Court begins and ends its analysis there.

The ICFA provides remedies for "purely economic injuries." *Flores v. Aon Corp.*, 2023 IL App (1st) 230140, ¶ 41 (Ill. App.

Ct. Sep. 29, 2023) (citing *Morris v. Harvey Cycle & Camper, Inc.*, 392 Ill.App.3d 399 (Ill. App. Ct. 2009)). "Actual damages must be calculable and 'measured by the [plaintiffs'] loss.' " *Morris*, 331 Ill.Dec. 819, 911 N.E.2d at 1053 (quoting *Chicago v. Mich. Beach Hous. Coop.*, 297 Ill.App.3d 317, 231 Ill.Dec. 508, 696 N.E.2d 804, 811 (Ill. App. Ct. 1998)). "The failure to allege specific economic damages precludes a claim brought under the [ICFA]." *Flores*, 2023 IL App (1st) 230140, ¶ 41.

Plaintiffs allege that they suffered actual monetary loss in the form of "overpaying" for Aspen's health services. (FAC ¶ 516). They also say that they used Aspen's online platform based on it's representation that their personal health information would be protected and not disclosed to unauthorized third parties. (FAC ¶¶ 9–10, 506). Plaintiffs, however, do not allege that but for Aspen's representations they would not have used its services or would have paid less for those services. Even if they had, this type of "benefit of the bargain" theory of damages, however, has been repeatedly rejected for non-products liability claims such as this. *See Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 968 (7th Cir. 2016) (citing *Remijas*, 794 F.3d at 695) (explaining that benefit of the bargain theories "have been adopted by courts only where the product itself was defective or dangerous and consumers claim they would not have bought it (or paid a premium for it) had they known of the defect"); *cf. In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 751 (7th Cir. 2011) (acknowledging financial injury when plaintiffs "paid more for the toys than they would have, had they known of the risks the beads posed to children"). Plaintiffs do not cite any authority that would otherwise support a benefit of the bargain theory in the context of data privacy. *Cf. Kurowski v. Rush System for Health* ("*Kurowski II*"), 683 F. Supp. 3d 836, 846 (N.D. Ill. 2023) (declining to expand the benefit of the bargain theory to plaintiffs' ICFA claim based on the defendant's failure to protect private health information).

***8** Accordingly, Plaintiffs' benefit of the bargain theory does not plausibly allege a monetary loss for purposes of the ICFA. Plaintiffs should note that they also cannot rely on allegations that Aspen's conduct caused a diminution in value of their personal data to allege an actionable harm for purposes of the ICFA. *See, e.g., Flores*, 2023 IL App (1st) 230140, ¶ 42 (declining to hold that "diminution in the value of personal information is a specific economic injury under the [ICFA]"). Aspen's motion to dismiss Count VI is therefore granted.

**B. Washington Consumer Protection Act ("WCPA") and California Unfair Competition Law ("CUCL")**

In Count XI and Count XIV, Plaintiffs allege that Aspen engaged in deceptive acts or practices in violation of the WCPA and CUCL. To state a claim under the WCPA, a plaintiff must allege that they "sustained damage to business or property." *Keodalah v. Allstate Ins. Co.*, 194 Wn.2d 339, 349–50 (2019). To state a claim under the CUCL, a plaintiff must allege that they "lost money or property." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 317 (2011); *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010). As set forth *supra* § III.A., Plaintiffs fail to satisfy this requirement. Thus, Counts XI and XIV are dismissed. *See Gragg v. Orange Cab Co., Inc.*, 942 F. Supp. 2d 1111, 1118–19 (W.D. Wash. 2013) (dismissing WCPA claim where alleged injury was privacy violation); *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 57 (2009) ("[p]ersonal injuries, as opposed to injuries to 'business or property,' are not compensable and do not satisfy the injury requirement").

**C. California Confidentiality of Medical Information Act ("CMIA")**

In Count XIII, Plaintiff C.M., on behalf of the California subclass, alleges that Aspen disclosed Plaintiff's medical information to unauthorized persons without first obtaining consent, in violation of the CMIA. Cal. Civ. Code § 56.10(a). Aspen argues that Plaintiff C.M. fails to state a claim under the CMIA because C.M. does not allege that medical information was transmitted, and C.M. does not allege that any individual viewed or accessed their information.

The CMIA defines "medical information" as "any individually identifiable information" possessed by or derived from a healthcare provider or contractor "regarding a patient's medical history, mental health application information, reproductive or sexual health application information, mental or physical condition, or treatment." Cal. Civ. Code § 56.05(j). "Individually identifiable information" includes all information containing "any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual." *Id.*

Here, C.M. claims that the information sent to third parties "included which Users were searching for a specific treatment, looking at pricing for a specific treatment or scheduling an appointment at a specific location for a specific treatment sought." (FAC ¶ 145). That third parties were apprised of which medical care a specific user was looking for is not enough to sustain a claim under the CMIA. Plaintiff fails to allege that the disclosed information necessarily reveals information about their "physical condition or treatment" as required by the CMIA. A person could very well search treatments, medical conditions, and potential providers for a partner, parent, or child. A person could also search for treatment that they ultimately do not need or are not eligible to receive. At this stage, Plaintiff's allegations do not plausibly allege that their medical information was transmitted. Thus, Count XIII is dismissed.

**IV. Common Law Claims**

**A. Negligence**

***9** In Count II, Plaintiffs assert a claim for common law negligence. To state a claim for negligence under Illinois law, "a plaintiff must plead that the defendant owed a duty of care to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injuries." *Cowper v. Nyberg*, 390 Ill.Dec. 115, 28 N.E.3d 768, 772 (Ill. 2015) (citing *Mt. Zion State Bank & Tr. v. Consol. Commc'ns, Inc.*, 169 Ill.2d 110, 214 Ill.Dec. 156, 660 N.E.2d 863, 867–68 (Ill. 1995)).

Aspen argues that Plaintiffs have not alleged that it owed Plaintiffs a duty of care beyond that of physician-patient confidentiality, and such a duty is insufficient to support a negligence claim because Illinois has not recognized an independent tort claim for breach of physician-patient confidentiality. (Dkt. 21 at 35). But Defendants fail to acknowledge Plaintiffs' allegation that Aspen owed Plaintiffs a duty to "exercise reasonable care to secure, safeguard and protect their highly sensitive Private Information" and that Aspen assumed a duty to protect Plaintiffs Private Information by making representations that it would not disclose Plaintiffs' Private Information without their consent. (FAC ¶ 9–10, 440). Plaintiffs' position is supported by PIPA which requires data collectors, *i.e.*, entities that handle, collect, disseminate, or otherwise deal with nonpublic personal information, to protect this information from "unauthorized access, acquisition, destruction, use, modification, or disclosure." 815 ILCS 530/45(a); *see also* 815 ILCS 530/5. The Complaint alleges that Aspen collected Plaintiffs' nonpublic personal information and disseminated that information to unauthorized third parties. Thus, the complaint plausibly alleges a duty to prevent the disclosure of their private health information.

**B. Unjust Enrichment**

In Count IV, Plaintiffs plead a claim for unjust enrichment. Unjust enrichment, however, "is not a separate cause of action under Illinois law." *Horist v. Sudler & Co.*, 941 F.3d 274, 281 (7th Cir. 2019); *see also Benson*, 944 F.3d at 648 (citing *All. Acceptance Co. v. Yale Ins. Agency, Inc.*, 271 Ill.App.3d 483, 208 Ill.Dec. 49, 648 N.E.2d 971, 977 (Ill. App. Ct. 1975), relying on *Charles Hester Enters., Inc. v. Ill. Founders Ins. Co.*, 137 Ill.App.3d 84, 91 Ill.Dec. 790, 484 N.E.2d 349, 354 (Ill. App. Ct. 1985), *aff'd*, 114 Ill.2d 278 (1986)). "[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011); *see also Flores*, 2023 IL App (1st) 230140, ¶ 37.

Like their ICFA claim, Plaintiffs' unjust enrichment claim alleges that Aspen collected and used Plaintiffs' personal health data for its own financial gain and retained those benefits at Plaintiffs' expense. (FAC ¶¶ 468–69.) Because that is the same improper conduct alleged in their ICFA claim, the Plaintiffs' unjust enrichment claim cannot stand. *See, e.g., Ramirez v. LexisNexis Risk Sols.*, ––– F. Supp. 3d ––––, No. 22 C 5384, 2024 WL 1521448, at *8 (N.D. Ill. Apr. 8, 2024). Aspen's motion to dismiss Count IV is therefore granted.

**<u>CONCLUSION</u>**

For the reasons set forth above, Aspen's motion [20] is granted in part and denied in part.

**All Citations**

Slip Copy, 2024 WL 4119153

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT E

2024 WL 3970796
United States District Court, D. Oregon,
Eugene Division.

M.R.,[1] Plaintiff,
v.
SALEM HEALTH HOSPITALS AND CLINICS, Defendant.

Civ. No. 6:23-cv-01691-AA
|
Signed August 28, 2024

**Attorneys and Law Firms**

Timothy S. DeJong, Stoll Stoll Berne Lokting & Shlachter, PC, Portland, OR, Dylan J. Gould, Pro Hac Vice, Terence Coates, Pro Hac Vice, Markovits Stock & DeMarco, LLC, Cincinnati, OH, Gary M. Klinger, Pro Hac Vice, Milberg Coleman Bryson Phillips Grossman PLLC, Chicago, IL, Glen L. Abramson, Pro Hac Vice, Milberg Coleman Bryson Phillips Grossman PLLC, Knoxville, TN, for Plaintiff.

Keith J. Bauer, Parks Bauer Sime Winkler & Fernety LLP, Salem, OR, Naoki Stephen Kaneko, Pro Hac Vice, Shook, Hardy & Bacon, L.L.P., Irvine, CA, Russell L. Taylor, Pro Hac Vice, Tammy Beth Webb, Pro Hac Vice, Shook, Hardy & Bacon L.L.P., San Francisco, CA, for Defendant.

**OPINION & ORDER**

AIKEN, District Judge.

***1** Plaintiff is a patient of Defendant Salem Health Hospitals and Clinics and brings this putative class action arising out of Defendant's alleged disclosure of Plaintiff's confidential personally identifiable information. Before the Court is Defendant's Motion to Dismiss ("MTD"), ECF No. 9. For the reasons below, the Motion is GRANTED IN PART and COUNT FOUR of the Complaint is DISMISSED.

**BACKGROUND**

**I. Factual and Procedural Background**

Plaintiff is a former patient of Salem Health. Compl. at 1. Defendant is a healthcare entity and is subject to applicable HIPAA and Oregon law regulations on disclosing personally identifiable protected health information. Compl. ¶ 10, 13. Defendant owns and controls https://www.salemhealth.org ("Defendant's Website" or the "Website"), which it encourages patients to use for booking medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, signing up for events and classes, and more. Compl. ¶ 3.

Plaintiff alleges that Defendant used hidden tracking tools embedded on its website, https://www.salemhealth.org, (the "Website"), Defendant Salem Health Hospitals and Clinics ("Salem" or "Defendant") intercepted Plaintiff's and Class Members' communications and forced their web browsers to send confidential and highly sensitive personally identifiable information ("PII") and personal health information ("PHI") (collectively, "Private Information") to undisclosed third parties such as Meta Platforms, Inc. ("Facebook") or Google, Inc. ("Google") without Plaintiffs' or Class Members' knowledge or consent. Compl. ¶¶ 5-6, 14, 54-58.

According to Plaintiff, the information Defendant intercepted and impermissibly disclosed to those third parties included booking of appointments, searches for specific medical treatment, particular health conditions, and other sensitive information. *Id.* Plaintiff asserts that Defendant used "Tracking Tools"—technology including Facebook Tracking Pixel ("Pixel"), Google Analytics, or Conversions API to boost its marketing efforts and profits by sharing Private Information despite protections offered to its patients through state and federal law and industry standards. *Id.* ¶¶ 44, 52-58. Plaintiff states that she used Defendant's web portal and their website, https://www.salemhealth.org ("Website"), to research medical symptoms, search for doctors, make appointments, and check medical records. *Id.* at ¶ 7. Plaintiff maintains that her unique IP address is also PII under HIPPA. An IP address is a number that identifies the address of a device connected to the Internet. *Id.* at 146.

Plaintiff asserts that Salem Health was compensated for this data and the data was used by Facebook and Google to optimize advertisements targeted to their users. *Id.* at 55-56, 164-167, 257.

In its motion to dismiss, Defendant asserts that Plaintiff consented to the disclosure of information via the Website's Terms of Service, and by creating Facebook and Google accounts, which requires agreeing to Facebook and Google's Terms of Service. MTD at 11; *see also* ECF No. 10

(Defendant's request for judicial notice of Facebook and Google's terms of service.)[2] Plaintiff alleges that she had no knowledge of Defendant's Tracking Tools and would not have consented to the disclosure of their information to third parties. Compl. ¶ 15, 59-60, 226.

**II. HIPPA Standards**

***2** Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization. *See* Health Insurance Portability and Accountability Act ("HIPPA"), 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i). The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."

The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103. 121. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

Under the HIPPA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination' "; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed[:]

> a. Names;
>
> * * *
>
> H. Medical record numbers;
>
> * * *
>
> J. Account numbers;
>
> * * *
>
> M. Device identifiers and serial numbers;
>
> N. Web Universal Resource Locators (URLs);
>
> O. Internet Protocol (IP) address numbers; ... and
>
> R. Any other unique identifying number, characteristic, or code ..."
>
> * * *
>
> "The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 160.514.

An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person ... shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity ... and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

**III. Protected Health Information Under Oregon Law**

Oregon law provides that "(1) It is the policy of the State of Oregon that an individual has:(a) The right to have protected health information of the individual safeguarded from unlawful use or disclosure." ORS § 192.553. Oregon law also provides in ORS § 192.558 that PHI may only be used or

disclosed consistent with prior authorization or without such authorization in particular circumstances.

## LEGAL STANDARD

***3** To survive a motion to dismiss under the federal pleading standards, a pleading must contain a short and plain statement of the claim and allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a pleading does not require "detailed factual allegations," it needs more than "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 677-78. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard ... asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. Legal conclusions without any supporting factual allegations do not need to be accepted as true. *Id.*

## DISCUSSION

Plaintiff brings claims for (1) breach of confidence; (2) unauthorized interception, use and disclosure in violation of the Electronic Communications Privacy Act ("ECPA"); (3) intrusion upon seclusion; (4) breach of implied contract; (5) unjust enrichment; and (6) negligence.

Defendant argues that the second claim under the ECPA should be dismissed because Plaintiff has not pled an unauthorized interception and, regardless, as a party, Defendant could consent to any interception. Defendant contends that the third claim for intrusion upon seclusion should be dismissed because no intentional intrusion occurred, and no intrusion occurred that would be highly offensive to a reasonable person. Defendant argues the fourth claim for breach of implied contract should be dismissed because Plaintiff cannot show the existence of mutual assent or consideration. Defendant argues the fifth claim for unjust enrichment fails because it is not a cause of action in Oregon and Plaintiff has another remedy available. Defendant argues that the sixth claim for negligence is barred by the economic loss rule and Plaintiff did not properly allege damages.

### I. Count One: Breach of Confidence

Defendant moves to dismiss Plaintiff's claim for breach of confidence on the basis that the disclosed information was not protected medical information, and that Plaintiff consented to the disclosure. MTD at 18.

To state a claim for beach of confidence, a plaintiff must allege an "unauthorized and unprivileged disclosure of confidential information obtained in a confidential relationship." *Humphers v. First Interstate Bank of Or.*, 298 Or. 706, 717 (1985). The basis for this confidential relationship must be "determined by a legal source external to the tort claim itself." *A. B. v. Or. Clinic*, 321 Or. App. 60, 70 (2022) (quoting *Humphers*, 298 Or. at 718). The burden is on the plaintiff to identify this source and show that it creates a duty to keep the information at issue confidential. *Id.*

Here, Plaintiff claims that HIPAA, ORS §§ 192.553 to 192.581 (governing protected health information ("PHI"), and the "implied covenant of trust and confidence" inherent in a physician-patient relationship creates a duty of to keep protected health information confidential. Compl. ¶¶ 186–87.

Defendant contends that the information disclosed could not plausibly fit the statutory definition of protected health information. HIPAA (45 CFR § 160.103) and ORS § 192.556 define PHI similarly as information "created or received by a health care provider ... and [r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care." 45 CFR § 160.103.

Plaintiff alleges that Defendant's Tracking Tools sent the following information to third parties:

> ***4** (1) status as medical patients; (2) health conditions; (3) desired medical treatment or therapies; (4) desired locations or facilities where treatment was sought; (5) phrases and search queries (such as searches for symptoms, treatment options, or types of providers); and (6) searched and selected physicians and their

specialties conducted via the general search bar.

Compl ¶ 61.

Plaintiff has plausibly pled violations of HIPAA privacy requirements. *See, e.g.* Compl. ¶¶ 88-90 (image showing that tracking tools on Defendant's Website reveal name of financial assistance form to Google, thereby revealing the user's status as a patient and that the patient is seeking financial assistance). As noted in the Complaint, HHS has expressly stated that entities like Defendant that implement the Facebook Pixel and Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-complaint authorization. Compl. ¶ 29. No such authorization was obtained. Thus, Plaintiff's claim that Defendant has violated HIPAA's confidentiality requirements is at least plausible at this stage of litigation. Defendant's motion to dismiss is denied as to this issue.

**II. Electronic Communications Privacy Act ("ECPA")**

Defendant argues that the second claim under the ECPA should be dismissed because Plaintiff has not pled an unauthorized interception and, regardless, as a party, Defendant could consent to any interception. MTD at 16-19.

In 1986, Congress passed a law called the Electronic Communications Privacy Act ("ECPA") to protect the privacy of electronic communications. Pub.L. No. 99–508, 100 Stat. 1848. Title I of the ECPA amended the Wiretap Act to expand its coverage beyond wire and oral communication and "address[ ] the interception of ... electronic communications." S.Rep. No. 99–541, at 3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3557. Title II of the ECPA created the Stored Communications Act, which was created to "address[ ] access to stored wire and electronic communications and transactional records." *Id.*

The ECPA "provides a private right of action against any person who 'intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication.' " Rodriguez v. Google LLC, No. 20-cv04688-RS, 2021 WL 2026726, at *6 (N.D. Cal. 2021). In *Campbell v. Facebook Inc.*, the Court explained:

> As the statutory text indicates, the focus of this provision is on the interception of the communication itself. While another provision of the Wiretap Act prohibits the use of the contents of a communication, that prohibition applies only if the interception itself is unlawful under section 2511(1)(a). Specifically, section 2511(1)(d) applies to any person who "intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication," but only if that person knows or has reason to know "that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." See 18 U.S.C. § 2511(1)(d) (emphasis added). In other words, if there is no unlawful interception, there can be no unlawful use.
>
> 77 F. Supp. 3d 836, 840 (N.D. Cal. 2014) (emphasis added).

The statute defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). The 9th Circuit has provided additional guidance on how to interpret this term. "To be 'intercepted' in violation of the Wiretap Act, [a communication] must be acquired during transmission, not while it is in electronic storage." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 878, (9th Cir. 2002).

***5** Defendant maintains that an "interception" within the meaning of the statute did not occur because the Tracking Tools do not contemporaneously capture and transfer patient data to Meta and Google, but instead copy the patient's data and transmit it over in a separate second transmission. MTD at 17. Some California courts have found that the function of similar tools does meet the definition of "interception" under the ECPA because an interception does not occur while the data is in transit. *See e.g.* *Barbour v. John Muir Health*, No. C22-01693, 2023 WL 2618967, at *5 (Cal. Super. Ct. 2023). However, at this stage, the Court reviews allegations in Plaintiff's complaint and does not weigh the evidence about the disputed method by which the Tracking Tools function.

In the Complaint, Plaintiff states that "Defendant has effectively used its source code to commandeer and 'bug' or 'tap' its patients' computing devices, allowing Facebook, Google, and other third parties to listen in on all of their communications with Defendant and thereby intercept those communications." Compl. ¶ 55. Further, that the Tracking Tools "manipulate[ ] the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Facebook and Google. These transmissions occur contemporaneously." *Id.* ¶ 56. Accepting

as true allegations that Tracking Tools function as Plaintiff asserts, this would plausibly meet the definition of an "interception" under the statute.

Defendant argues that Plaintiff's consent to the disclosure of any information bars the Plaintiff's claim under the ECPA. The ECPA states that "[i]t shall not be unlawful" to intercept a communication "where one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(d). However, § 2511(2)(d) describes a crime/tort exception, which clarifies that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act." *Id.*

The Court finds that Plaintiff has plausibly pled the crime/tort exception and, thus, Defendant cannot defeat Plaintiff's claim by consenting to the interception of the PHI. At this stage in the litigation, Plaintiff's claim sufficiently alleges a violation under the ECPA.

**III. Intrusion Upon Seclusion**

To state a claim for invasion of privacy, a Plaintiff must show "(1) an intentional intrusion, physical or otherwise, (2) upon the plaintiff's solitude or seclusion or private affairs or concerns, (3) which would be highly offensive." *Reed v. Toyota Motor Credit Corp.*, 301 Or App 825, 830-31, 459 P3d 253, 257 (2020), citing *Mauri v. Smith*, 324 Or. 476, 482, 929 P.2d 307 (1996). Defendant contends that Plaintiff has failed to allege an intentional intrusion and any alleged intrusion was not highly offensive.

Defendant argues that no intentional intrusion occurred because patients, like Plaintiff, voluntarily disclosed their information to Salem Health. Generally, if a party is aware of an observer's presence and still voluntarily chooses to disclose information, no intentional intrusion occurs. *See Snipes v. Wilkie*, No. 18-cv-03259-TSH, 2019 WL 1283936, at *7 (N.D. Cal. 2019).

Here, Plaintiff alleges that she was unaware that her information was being sent to third parties and that she could not make an informed choice to disclose information to unknown parties. Plaintiff alleges that she voluntarily disclosed PHI to Defendant as a part of the patient-physician relationship, but never intended Google and Facebook to receive it. Therefore, Plaintiff has plausibly alleged an intentional intrusion.

***6** Defendant argues that any alleged intrusion that occurred was not highly offensive because Plaintiff had no reasonable expectation of privacy and Salem Health did not have improper motives for the alleged disclosures. Defendant is correct that there is not a reasonable expectation of privacy in some standard internet activity, such as web searches. *See e.g. United States v. Heckenkamp*, 482 F.3d 1142, 1146 (9th Cir. 2007); *People v. Nakai*, 183 Cal. App. 4th 499, 518 (2010).

Congress and courts have consistently noted that personal medical information is among the most sensitive information that could be collected about a person, and the existence of many statutes like HIPAA and ORS § 192.553 regulating its disclosure supports this idea. *See Perez-Denison v. Kaiser Found. Health Plan of the Nw.*, 868 F. Supp. 2d 1065, 1090 (D. Or. 2012) ("HIPAA suggests Congress has determined reasonable people want their medical records private and strongly object to those records being inappropriately accessed). It is likely that disclosure of such personal and sensitive information would be highly offensive to a reasonable person. Therefore, Plaintiff has pled a valid claim for intrusion upon seclusion.

**IV. Breach of Implied Contract**

Plaintiff asserts a claim for breach of an implied contract between the parties. "An implied-in-fact contract, like any other contract, must be founded upon the mutual agreement and intention of the parties." *Moyer v. Columbia State Bank*, 315 Or. App. 728, 737 (2021) (internal quotation marks omitted). "A contract does not arise because one party desires it; there must be *mutual* assent. As we said in *Ken Hood Construction*, 'Contract formation requires "a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Restatement (Second) of Contracts* § 17(1) (1981).' " *Moyer v. Columbia State Bank*, 315 Or. App. 728, 737, 503 P.3d 472, 477 (2021) (quoting *Ken Hood Construction v. Pacific Coast Construction*, 201 Or. App. 568, 577, 120 P.3d 6 (2005)). "Unlike an express contract where an agreement is formed based on words, in an implied contract, the parties' agreement is inferred, in whole or in part, from their conduct." *Id.* at 737–38; *see also Gadalean v. SAIF*, 364 Or. 707, 717 n.3 (2019) ("This court has explained that a contract implied in fact arises where the natural and just interpretation of the acts of the parties warrants such [a] conclusion.").

Plaintiff claims there was an implied contract between patients and Salem Health that was breached by Salem Health when they disclosed patient information to third parties.

The Court finds Plaintiff's allegations insufficient to state a claim. Plaintiff has not pled facts tending to show that a meeting of the minds existed between this parties. When patients come to Salem Health Hospital seeking treatment, they enter a contract in which patients agree to pay for medical services and Defendant agrees to provide them. Patients understand that they are entering into a physician-patient relationship and can expect that Defendant will act in accordance with laws like HIPAA. However, Plaintiff has not pled facts that show Defendant's prospective patients would understand that they were entering into a contract to keep their information confidential. Entering into an implied contract requires "mutual agreement and intent" of both parties. A patient's choice to use Defendant as a medical service provider does not indicate an intention to enter into an implied contract for the security of information entered on Defendant's website. Although the parties undoubtedly agreed to enter into a contract for medical services, Plaintiff has failed to show that patients could plausibly believe that an implied contract existed to keep information entered on Defendant's website confidential. Defendant's motion is granted as to this claim.

**V. Unjust Enrichment**

***7** The plaintiff asserts a claim for unjust enrichment on that basis that Plaintiff and class members provided Defendant with their confidential information and Defendant unjustly retained the benefit from the sale of this information. Defendant first argues in their motion to dismiss that unjust enrichment is not an independent cause of action in Oregon.

The Oregon Supreme Court recently discussed unjust enrichment claims under Oregon law in *Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or. 115, 404 P.3d 912 (2017). The court explained that "Oregon courts should examine the established legal categories of unjust enrichment as reflected in Oregon case law and other authorities to determine whether any particular enrichment is unjust." *Id.* at 132. When applying this doctrine, Oregon courts must determine whether the alleged enrichment is unjust by examining whether the allegations match already recognized forms of unjust enrichment by Oregon case law and treatises.

In this case, Plaintiff clarified in their Response that they intended to plead a quasi-contractual claim of unjust enrichment. Resp. at 29. Oregon courts have recognized this type of unjust enrichment claim. *See* e.g. *Farmer v. Groves*, 276 Or. 563, 568, 555 P.2d 1252 (1976); *Wilson v. Gutierrez*, 261 Or. App. 410, 414–15, 323 P.3d 974, 978 (2014). The elements for this claim are "(1) a benefit conferred, (2) awareness by the recipient that she has received the benefit, and (3) it would be unjust to allow the recipient to retain the benefit without requiring her to pay for it." *Cron v. Zimmer*, 255 Or. App. 114, 130, 296 P.3d 567 (2013). The Complaint alleges that the benefit conferred was medical information of patients; that Defendant took affirmative steps to collect it; and that it would be unjust for Defendant to retain the benefit from selling this information to advertisers. This amounts to a plausible claim for unjust enrichment.

Defendant also contends that since Plaintiff has an adequate remedy at law the unjust enrichment claim must be dismissed. At this stage of the proceedings, it would not be appropriate to dismiss this claim for that reason. *See Martell v. Gen. Motors LLC*, 492 F. Supp. 3d 1131, 1148 (D. Or. 2020) (denying motion to dismiss unjust enrichment claim and stating, "[a]t this stage of the litigation, it is unknown whether the remedy at law meets this standard."). Defendant's motion is denied on this issue.

**VI. Negligence**

To prove a negligence claim, one "must allege facts from which a factfinder could determine (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of the kind that the law protects against [ ], (3) that [the] defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that [the] plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent." *Tomlinson v. Metro. Pediatrics, LLC*, 275 Or. App. 658, 676 (2015), *aff'd*, 362 Or. 431 (2018).

Defendant alleges that (1) Plaintiff's negligence claim is barred by the economic loss doctrine, and (2) Plaintiff fails to allege recoverable damages. MTD at 26.

As damages, Plaintiff has pled a loss of privacy. Compl. ¶ 229-e. Courts have recognized loss of privacy constitutes damages for a negligence claim. See, e.g., Mehta v. Robinhood Fin. LLC, No. 21-CV-01013-SVK, 2021 WL 6882377, at *6 (N.D. Cal. May 6, 2021) ("As to damages, Plaintiffs adequately allege damages, including 'the loss of control over the use of their identity, harm to their constitutional right to privacy, ... and privacy injuries associated with having their sensitive personal and financial information disclosed.' ") (citation omitted); Flores-Mendez v. Zoosk, Inc., No. C 20-04929 WHA, 2021 WL 308543, at *4 (N.D.

Cal. Jan. 30, 2021) ("[P]laintiffs adequately allege damages in the form of ... loss of privacy with respect to highly sensitive information ... and risk of embarrassment."). This is particularly true in the pixel context. *See, e.g., In re Grp. Health Plan Litig.*, 2023 WL 8850243, at *6 ("Plaintiffs have alleged loss of privacy, mental anguish, diminished value of private information, and other forms of harm. The forms of damages sought by Plaintiffs are cognizable.") (internal citation omitted). Plaintiff has satisfied the damages element for a common law claim of negligence, and her claim is not precluded by the economic loss doctrine.

***8** Plaintiff has also alleged as damages the diminished value of their private information. Compl. ¶ 196-h. Courts in the Ninth Circuit and around the country have accordingly held that the diminished value of sensitive health or personal information supports a negligence claim. *See, e.g., Brown v. Google, LLC*, 2021 WL 6064009, at *17 (N.D. Cal. Dec. 22, 2021) ("*Brown I*") (plaintiffs lost money when Google took "valuable data" and "received no money in return"); *Calhoun v. Google LLC*, 526 F.Supp.3d 605, 635 (N.D. Cal. 2021); *Feins v. Goldwater Bank NA*, 2022 WL 17552440, at *8 (D. Ariz. Dec. 9, 2022) (recognizing diminished value of PII); *In re Marriott Int'l, Inc., Cust. Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 461 (D. Md. 2020) ("[T]he growing trend across courts that have considered this issue is to recognize the lost property value of this information.").

At this stage of litigation, Plaintiff has plausibly alleged damages under their negligence claim. Defendant's motion is denied as to this claim.

A. Economic Loss Doctrine.

Alternatively, Defendant argues that Plaintiff's negligence claim is barred by the Economic Loss Doctrine. Plaintiff alleges that Defendant had a duty to keep its patients' Private Information confidential under ORS § 192.553. Defendant contends that the economic loss rule prohibits Plaintiff from raising a negligence claim on the basis that Plaintiff's loss is purely economic. MTD. at 26, *citing Harris v. Suniga*, 344 Or. 301, 305 (2008). However, the economic loss doctrine only "bars a party that has suffered a purely economic loss from bringing a negligence action," and regardless, does not apply if "there is a special relationship between the parties." *Harris v. Suniga*, 344 Or. 301 at 305 (emphasis added). "Examples of special relationships include lawyer-client relationships, physician-patient relationships and trustee-beneficiary relationships." *Doe v. Wright*, No. 2:23-CV-00332-HL, 2023 WL 6810734, at *17 (D. Or. Oct. 16, 2023). Defendant's motion to dismiss is denied as to this issue.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss, ECF No. 9, is DENIED IN PART and GRANTED IN PART. Count IV of the Complaint is DISMISSED.

It is so ORDERED and DATED this 28th day of August 2024.

### All Citations

Slip Copy, 2024 WL 3970796, Med & Med GD (CCH) P 308,225

## Footnotes

1 Plaintiff brings this lawsuit anonymously out of a desire to protect her personal health information under the Health Insurance Portability and Accountability Act of 1996 and Oregon law. Compl. at 2.

2 Federal Rule of Evidence 201(b) allows the Court to "judicially notice a fact that is not subject to reasonable dispute [if] it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." In addition, under the "incorporation by reference" doctrine, the Court may consider "the existence and contents" of documents relied upon or referenced by plaintiffs in their complaint. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n. 10 (9th Cir. 2014)

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.